SEATTLE SCHOOL DISTRICT NO. 1 OF KING COUNTY, WASHINGTON, a Municipal Corporation, et al., Plaintiffs,

and

American Civil Liberties Union et al., Intervenor Plaintiffs,

v.

The STATE of Washington et al., Defendants,

and

Citizens for Voluntary Integration Committee (Ci.V.I.C.) et al., Intervenor Defendants.

No. C78–753V.

United States District Court, W. D. Washington.

June 15, 1979.

Foster, Pepper & Riviera, Camden M. Hall, Seattle, Wash., associated with Michael W. Hoge, Seattle, Wash., Asst. Gen. Counsel for Seattle School Dist. No. 1, for Seattle School Dist. No. 1 of King County, Washington, and original plaintiffs except Tacoma School Dist.

Kane, Vandeberg & Hartinger, Elvin J. Vandeberg, Tacoma, Wash., for Tacoma School Dist.

Thomas F. Carr, Asst. Atty. Gen., Malachy Murphy, Deputy Asst. Atty. Gen., Olympia, Wash., for State of Washington and other state defendants.

Short, Cressman & Cable, James A. Oliver, Seattle, Wash., for Ci.V.I.C.

Davis, Wright, Todd, Riese & Jones, Thomas A. Lemly, Seattle, Wash., for Church Counsel of Greater Seattle, Siquelands and Higashis.

Davis, Wright, Todd, Riese & Jones, Hall Baetz, Seattle, Wash., for Pasco Neighborhood Council, et al.

Shidler, McBroom, Gates & Baldwin, Wm. H. Neukom, Seattle, Wash., for Seattle Urban League, Proctors, Hazzards, Conyears and Elliott.

Sweet & Dussault, William L. E. Dussault, Seattle, Wash., for American Friends Service Committee and Gallegos.

Franco, Asia, Bensussen, Coe & Finegold, James S. Rogers, Seattle, Wash., for American Jewish Committee, Seattle Chapter.

MacDonald, Hoague & Bayless, Frederick L. Noland, Seattle, Wash., for American Civil Liberties Union, Levants and Shoji.

Burton, Crane, Covello, Philip L. Burton, Seattle, Wash., for NAACP Seattle Branch, Loren Miller Bar Assoc., Howells and Laytons.

Susan Barnes, Asst. U.S. Atty., Seattle, Wash., Iris Green, Atty., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for United States.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

VOORHEES, District Judge.

Based upon the complete record in this case, including testimony and evidence introduced at the trial of this matter, the Court makes the following:

### FINDINGS OF FACT

1. *Parties*

1.1 Plaintiff Seattle School District No. 1 of King County, Washington (sometimes called "Seattle" or the "District" herein) is under Revised Code of Washington Title 28A ("RCW 28A") a lawfully organized and functioning municipal corporation. It is charged by law of the State of Washington "to provide without distinction or preference on account of race, color, caste or sex . . . a general and uniform system of public schools" (An.Const. art. IX, §§ 1 and 2) for the educational instruction of the approximately 54,000 common school students, of whom 37.3 percent are racial minorities according to current federal reporting categories, in kindergarten and grades 1 through 12. There are approximately 112 schools in Seattle, which is the largest public school district in the State of Washington, the boundaries of which are substantially coterminous with the boundaries of the City of Seattle, King County, Washington.

1.2 Plaintiff Tacoma School District No. 10 of Pierce County, Washington (sometimes "Tacoma" herein) is under RCW 28A a lawfully organized and functioning mu-

nicipal corporation. It is charged by law of the State of Washington "to provide without distinction or preference on account of race, color, caste or sex . . . a general and uniform system of public schools" for the educational instruction of the approximately 29,000 common school students, of whom 20 percent are racial minorities according to current federal reporting categories, in kindergarten and grades 1 through 12. There are approximately 57 schools in Tacoma, which includes the City of Tacoma, the incorporated towns of Fircrest and Ruston and the unincorporated areas of Hunt's Prairie, Dash Point and Brown's Point which are substantially coterminous with the boundaries of the City of Tacoma, Pierce County, Washington.

1.3 Plaintiff Pasco School District No. 1 of Franklin County, Washington (sometimes "Pasco" herein) is under RCW 28A a lawfully organized and functioning municipal corporation. It is charged by law of the State of Washington "to provide without distinction or preference on account of race, color, caste or sex . . . a general and uniform system of public schools" for the educational instruction of the approximately 5,300 common school students, of whom 26.5 percent are racial minorities according to current federal reporting categories, in kindergarten and grades 1 through 12. There are approximately ten schools in the Pasco School District, which includes the City of Pasco and the contiguous unincorporated areas of south Franklin County, Washington.

1.4 Plaintiff Board of Directors of Seattle School District No. 1 (sometimes the "Board" herein) is composed of seven publicly elected members. The Board commits itself and adopts policy by a majority vote of its members. It is the statutorily constituted legislative, adjudicative, and administrative governing body of the District and is responsible for operating and setting administrative and educational policy for the District. All plaintiff Board members have taken as a prior condition of assuming their public duties the following oath of office:

I do solemnly swear that I will faithfully and impartially perform the duties of Director, Seattle School District No. 1 as prescribed by law and to the best of my ability, and that I will support and maintain the Constitution of the State of Washington and the United States. So help me God.

1.5 As indicated in the caption to this document plaintiffs Sutton, Alexander, Bleakney, Olson, Hollingsworth and Hittman are members of the Seattle School Board whose identified children are attending school in Seattle. They have been declared guardians ad litem for those children by Order of this Court.

1.6 Plaintiffs Vassar, Annie Jones, Wasserman, Davis, Andrews, Tangalin, Santos, Marr, Joe and Mona Jones, Charles, and Taupule are parents of children, identified in the caption to this document, who are attending school in Seattle. They have been declared guardians ad litem for those children by the Order of this Court.

1.7 The individual plaintiff students represent the diverse racial and ethnic mix of students in Seattle.

1.8 Intervenor plaintiff American Civil Liberties Union of Washington (ACLU of Washington) is the Washington State affiliate of the American Civil Liberties Union, a nationwide, nonprofit, nonpartisan organization dedicated to the promotion and protection of the civil rights and liberties of all persons.

1.9 Intervenor plaintiff American Friends Service Committee (AFSC) is an international social change organization related to the Society of Friends (Quakers). Among the AFSC's basic goals is the protection and promotion of the civil rights and liberties of all persons.

1.10 Intervenor plaintiff Church Council of Greater Seattle is an ecumenical organization established in 1969 to provide a structure within which 22 church denominations (local congregations, and church-related entities, Protestant and Catholic, in the Metropolitan Seattle Area) can work cooperatively.

1.11 Intervenor plaintiff Loren Miller Bar Association, a Washington nonprofit corporation, is comprised of approximately 45 lawyers admitted to practice in one or more states of the United States. It is an affiliate of the National Bar Association, comprised of lawyers of minority races. The Loren Miller Bar Association was organized statewide in the mid-1960's, having as a primary purpose the provision of legal assistance to minority persons in cases involving deprivation of civil rights and liberties.

1.12 Intervenor plaintiff Seattle Branch, National Association for the Advancement of Colored People (Seattle Branch, NAACP) is the local affiliate of the NAACP. Throughout its 60 year existence, the NAACP has had as a primary purpose the achievement of quality integrated education for all persons regardless of race.

1.13 Intervenor plaintiff Seattle Chapter of the American Jewish Committee is the local branch of a national organization founded in 1906 with stated purposes of resisting and eliminating racism, bigotry and anti-Semitism.

1.14 Intervenor Plaintiff Seattle Urban League is a local affiliate of the National Urban League, a nationwide, nonprofit, nonpartisan organization dedicated to equal opportunity and racial justice.

1.15 Each of the intervenor plaintiff organizations described in paragraphs 1.8 through 1.14 above has members or constituents whose minor children attend the Seattle schools, and each intervenor plaintiff sues on its own behalf and on behalf of such members and their children.

1.16 The individual intervenor plaintiffs named in the caption to this document are taxpayers residing within the boundaries of Seattle and are parents of minor children, named in the caption to this document, who attend public schools in Seattle. These individual plaintiffs are black, white, Chicano, and Asian-American citizens of the United States who bring this action each on their own behalf and on behalf of their minor children, for whom they have been appointed guardians ad litem by Order of this Court.

1.17 The rights of the members or constituents of the above intervenor plaintiff organizations and other persons to equal protection of the laws is germane to the organizational purposes of the intervenor plaintiff organizations.

1.18 Additional intervening plaintiff East Pasco Neighborhood Council is a nonprofit corporation organized under the laws of the State of Washington in 1971. The East Pasco Neighborhood Council is primarily composed of minority individuals and families. The general membership resides in an area known as "East Pasco." East Pasco is an area which has been physically segregated from the business area and majority population of Pasco by the tracks of the Northern Pacific Railroad. These railroad tracks were constructed in approximately 1943.

1.19 The individual additional intervening plaintiffs named in the caption are all residents of East Pasco. Each of these individual intervening plaintiffs is a racial minority in Pasco, and each is a parent or guardian ad litem, as identified in the caption, for a student of the Pasco School District No. 1 of Franklin County, Washington.

1.20 Additional intervenor plaintiff the United States of America has statutory authority under Section 902 of Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2, to participate in actions, such as the present matter, involving alleged denial of equal protection of the laws. The Attorney General has certified that this case is of general public importance.

1.21 Defendant the State of Washington is one of the fifty United States of America.

1.22 Defendant Dixy Lee Ray is Governor of the State of Washington.

1.23 Defendants John Bagnariol and Duane L. Berentson are the principal officers of the Washington State House of Representatives. Defendant John A. Cherberg is the principal officer of the Washington State Senate.

1.24 Defendant Slade Gorton is Attorney General of the State of Washington.

1.25 Defendant Frank B. Brouillet is Washington State Superintendent of Public Instruction.

1.26 Defendants H. Eugene Hall, Levy S. Johnston, Jack L. Reid, Edward Diamond, Mark E. Hoehne, Roger H. Lincoln, Walter H. Lewis, James M. Spalding, Ollie Mae Wilson, Orville Barnes, Grant L. Anderson, Eileen B. Kalles, Philip B. Swain, and Robert B. Stookey are all of the members of the Washington State Board of Education.

1.27 Defendant Norman K. Maleng, Prosecuting Attorney of King County, Washington has been dismissed from these proceedings.

1.28 Intervenor defendant Citizens for Voluntary Integration Committee (CiVIC) is a Washington nonprofit corporation which was a drafter, sponsor, organizer, and campaigner for Initiative Measure No. 350, the subject matter of this lawsuit.

1.29 CiVIC was formed on or about December 28, 1977 with the stated purposes of opposing mandatory school assignments based on racial or ethnic identification, proposing affirmative programs of voluntary integration, and promoting quality education on an equal basis for all. A copy of the CiVIC Articles of Incorporation was filed with the Secretary of State of the State of Washington on or about January 16, 1978.

1.30 Intervenor defendants Peter and Sandra King, Dahley, Bates, Liddell and George and Sally King are parents of the children, identified in the caption, who attend school in Seattle.

## 2. *Tender to State; Rejection*

2.1 On November 28, 1978, original plaintiff individuals and taxpayers formally tendered this action to the Attorney General of the State of Washington demanding that he promptly initiate and competently prosecute proper legal action to have Initiative 350 declared unconstitutional. The Attorney General declined plaintiffs' request to institute this action in his letter of December 19, 1978.

## 3. *General Facts and Historical Context; Segregation of Plaintiff School Districts; Failure of "Voluntary" Desegregation*

3.1 An educational system in which minority students are relatively segregated from white students provides an unequal and poorer education than a system in which the schools are racially balanced.

3.2 The three plaintiff school districts have had, and in some instances continue to have, racially imbalanced schools. The term "racial imbalance" in a school is used to mean a disproportionately high minority enrollment in a particular school in relation to districtwide minority student population. The term "segregation" is used to mean, where indicated, racial separation in housing patterns.

3.3 In each of the plaintiff school districts, there are residential areas in which minority races are predominant.

3.4 The preponderance of minority families live in the central and the southeast quarter areas of the City of Seattle. Those Seattle schools which are most crowded are located in those areas of the city where the preponderance of minority families live.

3.5 Residential segregation in Seattle and the proportion of minorities in the school system are such that elimination of racial imbalance in the public schools cannot be accomplished through "voluntary" desegregation strategies consistent with Initiative 350.

3.6 The segregation of housing by races in Seattle cannot be expected to change sufficiently to permit the racial balancing of public schools to be accomplished within the reasonably foreseeable future unless some students are assigned to schools other than their nearest or next nearest schools.

3.7 It is difficult to gauge the degree to which "racial bias" influences opinions about "busing." Nevertheless, racial bias or racial motivation is a factor in the opposition to the "busing" of students to attain racial balance.

3.8 Plaintiff school districts have for some time attempted to reduce or eliminate the racial imbalance existing in their schools. But for these efforts which direct or permit many students to attend schools other than their nearest or next nearest schools, there would be even greater racial imbalance in the schools of plaintiff school districts.

3.9 The closure of schools is not a practicable tool for racial balancing because there is such great and emotional opposition to the closure of schools.

3.10 The measures taken by the Seattle and Tacoma School District plaintiffs to balance their schools racially have met with both public opposition and public support. In the Seattle School District, the opposition has included several lawsuits and an unsuccessful recall election directed at school board members who in 1971 voted to implement a middle school desegregation program which included mandatory student assignments to non-"neighborhood" schools. The mandatory assignment feature of the middle school program was the most controversial part of the program and was the primary reason for the recall attempts.

3.11 On October 19, 1978, defendant State Board of Education adopted a policy statement, applicable to the State's common schools, condemning racial segregation in schools and urging the elimination of segregation from the State's public schools. On that same day, the State Board adopted a definition of racial isolation which was the same as that adopted by the Seattle School Board by its Resolution 1977–8.

3.12 At the commencement of the 1978–79 school year, there were 769,040 students enrolled in the public schools of this State. At time of trial approximately 300,000 students were being transported by bus to public schools in the State. Ninety-five percent of those students were being transported for reasons unrelated to school district attempts to reduce or eliminate racial imbalance in the schools.

4. *Historical Background as to Pasco*

4.1 In 1943 the Energy and Research Development Administration, at that time known as the Manhattan Project, selected the Hanford site for the production of plutonium for the atomic bomb. The Pasco population in 1943 was predominantly white. Substantial numbers of blacks began to arrive in the Tri Cities to work on the Manhattan Project at Hanford. At that time Richland was a federal government-owned town and under rigid federal housing regulations which excluded blacks. Blacks were unable to find housing in Richland, Kennewick or certain areas of Pasco. The availability of homes for blacks was greater in east Pasco. Blacks and other minorities began to move into the east Pasco area, east of the railroad tracks.

4.2 With the phasing out of the Manhattan Project and the scaling down of the activities of the U.S. Atomic Energy Commission, many individuals stayed and sought whatever work was available. Black population in east Pasco continued to increase, and there began a trend of migration of whites to the west Pasco area. New schools in the Pasco School District ("Pasco") followed these population shifts. One original school, Whittier Elementary School, was left in east Pasco. The residential segregation in Pasco resulted in a racially imbalanced public school system.

4.3 In the spring of 1965 the Pasco School Board elected to close predominantly black Whittier Elementary School. The Board voluntarily adopted a systematic plan for equalizing pupil distribution by race throughout the Pasco School System. A pupil transportation scheme was developed to facilitate this, and attendance boundaries were changed. Only minority children have been bused in order to implement the Pasco plan. No white students have been transported to achieve racial balance.

4.4 East Pasco is between 92 and 97 percent minority.

4.5 The Pasco District has seven elementary schools. Three would be predominantly white and three predominantly minority if students attended the school nearest to their homes. Current minority percentages in the elementary schools are as follows:

| | |
|---|---|
| Mark Twain | 15.7% |
| Longfellow | 50.0% |
| Livingston | 15.3% |
| Gray | 38.9% |
| Robert Frost | 31.6% |
| Emerson | 44.8% |
| Markham | 12.9% |

### 5. *Historical Background as to Tacoma*

5.1 For over a decade the Tacoma School District has allowed students to attend schools other than those geographically closest to their homes for the purpose of preserving an appropriate racial balance in its schools. Through a program of both mandatory actions (school closures and racially controlled enrollment at magnet schools) and voluntary alternatives for students and parents (optional enrollment, busing, and counseling), the Tacoma School District has been able to lessen the racial imbalance in its schools. The Tacoma School District's definition of a racially imbalanced school is one that has a combined minority enrollment of 50 percent or more or a single minority of 40 percent or more. All student enrollment in the Tacoma School District is subject to the district's policy of maintaining a racially balanced school district.

5.2 In the early 1960's, Tacoma School District personnel and community leaders realized that housing patterns and other factors had led to relatively high concentrations of racial minorities at certain of the district's schools.

5.3 In July 1966, the Tacoma School Board adopted a voluntary optional enrollment policy for students attending McCarver Junior High School, a central area facility experiencing minority enrollment exceeding 50 percent of the school population. Students who resided in the attendance area for McCarver Junior High School were given the option to attend other junior high schools in the district. In addition, students at other junior high schools were given an opportunity to attend McCarver Junior High School, provided that such attendance would reduce the racial imbalance existing at McCarver. The Tacoma School District provided special bus transportation for students participating in this optional enrollment program.

5.4 In June 1967 the voluntary optional enrollment program was expanded to include these central area elementary schools: McCarver, Stanley, Central and Bryant Elementary Schools. Students residing in the attendance areas for those schools were given the option to attend any elementary school in the Tacoma School District. In addition, optional enrollment opportunities were extended to students attending elementary schools outside the central area to attend the central area elementary schools if transfer into the schools would tend to reduce racial imbalance.

5.5 In October 1967 minority enrollment at McCarver Elementary, Stanley, and McCarver Junior High Schools was in excess of 50 percent of the total student population of those schools.

5.6 In April 1968 the Tacoma School Board adopted major changes designed to ease the perceived racial imbalance in Tacoma schools. The changes included:

a. Closure of McCarver Junior High School as a junior high school, and transfer of all junior high school students attending McCarver to junior high schools throughout the district;

b. Establishment of an exemplary elementary school ("magnet school") at the McCarver Junior High School facility, with admission open to students throughout the district by voluntary application only, and with student attendance controlled by the district to preserve an appropriate racial balance;

c. Closure of Central Elementary School;

d. Transfer of all sixth graders at Stanley Elementary School to other elementary schools throughout the district;

e. Reaffirmation of the district's position that no high school in the Tacoma School District would be allowed to become racially imbalanced.

5.7 Following this school district action, McCarver Elementary School went from an

87 percent black population in 1967 to a 53 percent black population in 1969.

5.8 In May 1970 the Tacoma School Board adopted policies specifically committing the district to the reduction of racial imbalance to levels within the State Board of Education guidelines, and establishing a technologically advanced elementary school ("magnet school") at Stanley Elementary, with an admission program similar to that existing at McCarver Elementary.

5.9 By September 1971 the elimination of board-defined racial imbalance at McCarver Elementary School had been completed.

5.10 By September 1972 no school in the Tacoma School District had minority enrollment in excess of 50 percent of total student enrollment except Hawthorne, which was closed as a school building in 1973–74.

5.11 In November 1972 the Tacoma School Board adopted a limited voluntary optional enrollment program for high school students, allowing high school students to attend, with certain qualifications, the schools of their choice.

5.12 In February 1974 the Tacoma School Board extended the voluntary optional enrollment program, with certain qualifications, to all grade levels throughout the district.

5.13 The Tacoma School District currently operates educationally enhanced (magnet school) programs at McCarver Elementary School and Stanley Elementary School. Both are located in the Tacoma central area. Those elementary schools are now operated as districtwide elementary schools with attendance selections made solely by application. Students are accepted in those schools in light of the number of student vacancies at the schools and in light of the racial balance at those schools.

5.14 As a part of the magnet school programs at McCarver and Stanley Elementary Schools, attendance at those schools is controlled by the Tacoma School District to maintain a racial balance within the district, state and federal guidelines. At the initiation of the Tacoma School District magnet school program in 1968–1970 some students living in the geographic attendance areas immediately surrounding McCarver and Stanley were denied enrollment at those schools because their attendance would adversely affect the racial balance. Thus, students, and particularly black students, whose attendance would have disrupted the desired level of racial balance at Stanley and McCarver were assigned to other elementary schools throughout the Tacoma School District. At present, changes in housing patterns, optional enrollment, busing and counseling have permitted all students residing in McCarver Elementary School geographic attendance area to attend that school, it they wish, without creating a racially imbalanced school. However, at present, 70 students from the Stanley attendance area are denied admission to Stanley Elementary School.

5.15 The optional enrollment program operated by the Tacoma School District allows students to attend any school within the Tacoma School District, except the Stanley and McCarver Elementary Schools, whose attendance is controlled by the district through voluntary applications. To assist the students' and parents' decisions concerning optional enrollment, the district has operated an extensive summer counseling program to counsel parents and students concerning the availability of educational opportunities at schools other than those nearest the homes of the students.

5.16 Public transportation is an element of both the magnet school and the optional enrollment programs. Transportation is funded by the district, though transportation services are actually delivered by the Tacoma Transit System. Currently, approximately 1,394 students bus in and out of the Tacoma central area as a part of the magnet school program. Approximately 1,200 additional students annually participate in the optional enrollment program and many of those students use bus transportation to travel between their homes and schools. Of the approximately 1,394 students busing in and out of the Tacoma central area, approximately 444 are elemen-

tary school children who reside in geographic areas in which either McCarver or Stanley is the nearest or next nearest elementary school. For most of these students, McCarver or Stanley is also their next-nearest school.

### 6. *Historical Background as to Seattle*

6.1 For many years the Seattle School District ("Seattle") has taken steps to end racial imbalance of its schools. These steps have often been associated with significant public controversy. In addition to the present litigation, Seattle has been a party to several lawsuits and administrative proceedings relating to desegregation. Some are:

*Campbell et al. v. Seattle School District No. 1*, Cause No. 9171 before the United States District Court for the Western District of Washington (suit to require "an acceptable plan to achieve meaningful racial balance in the public schools throughout Seattle . . ." (Complaint, page 6) filed on or about August 28, 1970 and dismissed October 12, 1972);

*State ex rel. Citizens Against Mandatory Bussing v. Brooks, ("CAMB I")*, 80 Wash.2d 121, 492 P.2d 536 (1972) (concerning the sufficiency of a petition to recall School Board members who voted for a controversial multi-racial middle school and mandatory busing program);

*Citizens Against Mandatory Bussing v. Palmason, ("CAMB II")*, 80 Wash.2d 445, 495 P.2d 657, 50 A.L.R.3d 1076 (1972) (a companion case to *CAMB I*—except here plaintiffs unsuccessfully asserted, to a unanimous court, a "right" to have their children attend neighborhood schools in contravention of the District's adopted middle school desegregation plan. This case established the rule that local school districts in Washington are responsible for and have the sole right to assign students to particular schools.

*Dawson v. Troxel*, 17 Wash.App. 129, 561 P.2d 694 (1977) (suit unsuccessfully challenging the District's policy denying majority race (white) children the option of transferring out of the predominantly mi-

nority Garfield High School attendance area; this policy was designed to promote the desegregation of Garfield);

*Coney v. Seattle School District No. 1*, Civil Action No. C75–650M before the United States District Court for the Western District of Washington (concerning the same policy challenged in *Dawson* and demanding that Garfield be closed, school boundaries be changed to require all Seattle high schools to have the same ratio of black and white students, and the neighboring school districts be drawn into a "regional desegregation plan." (Complaint, pages 16–17 filed about September 9, 1975 and dismissed May 6, 1977);

*Simmons v. Seattle School District No. 1*, Civil Action No. C76–134V consolidated with *Nakamura v. Seattle School District No. 1*, Civil Action No. C76–135V before the United States District Court for the Western District of Washington (these two cases also involved the District's Garfield transfer policies and sought roughly the same relief as *Coney*. *Simmons* and *Nakamura* were filed about February 27, 1976. They were dismissed July 29, 1977);

Numerous complaints under Title VI of the 1964 Civil Rights Act have been filed with the Office for Civil Rights ("OCR") of the United States Department of Health, Education and Welfare ("HEW"). Some of these complaints involved teacher assignments and bilingual education requirements ("*Lau*" compliance—named after a related lawsuit (*Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974)) in which the District was not a party). The National Association for the Advancement of Colored People ("NAACP") filed a complaint with OCR on April 22, 1977 challenging the segregation of the Seattle Public Schools and calling upon OCR to terminate all federal funding to the District until it is desegregated. This complaint was settled by a Memorandum of Agreement between OCR and the District on June 7–8, 1978.

*Roe, et al. v. Seattle School District No. 1 ("Roe I")*, King County Superior Court Cause No. 838291, and *Roe, et al. v. Seat-*

tle School District No. 1 ("Roe II"), King County Superior Court Cause No. 839530, filed about December 13, 1977 and January 13, 1978, respectively (these cases challenged and sought to enjoin the District's adoption and implementation of the Seattle Plan for elimination of racial imbalance adopted by the Seattle School Board on December 14, 1977. The cases were consolidated and dismissed pursuant to the District's motion for summary judgment. They are presently on appeal to the Washington State Supreme Court); *Velikanje, et al. v. Seattle School District No. 1 and Washington State Department of Ecology*, Thurston County Superior Court of Washington Cause No. 78–2–00066–2, filed in July 1978 (seeks to enjoin operation of the Seattle Plan on the theory that the District did not prepare an environmental impact statement for it. Trial of this matter has been continued pending the outcome of this action).

6.2 Since 1963 Seattle has had voluntary racial transfer programs whereby students could transfer to schools outside their residential attendance area if doing so improved racial balance in the sending and receiving schools.

6.3 In 1971 the Board voted to adopt a middle school mandatory assignment desegregation plan. Implementation of the middle school plan, which involved the creation and maintenance of five racially-balanced middle schools through mandatory student assignments, was delayed one year by reason of *Citizens Against Mandatory Bussing v. Palmason*. Adoption of the middle school plan also prompted an effort to recall four Board members who voted for the plan. The recall effort failed by a narrow margin at the polls.

6.4 Effective August 1976, the Board hired a new Superintendent, Dr. David L. Moberly, and directed him to develop and implement a desegregation program for the Seattle schools.

6.5 During school year 1976–77 and the summer of 1977 the Seattle School District developed, publicized, and encouraged participation in a "magnet" school desegregation program. The program, implemented in 1977–78, permitted students to transfer voluntarily from their "neighborhood" schools to "magnet" schools which contained educational programs designed to attract students.

6.6 The magnet program succeeded in promoting student movement to a greater degree than had ever before been experienced. It did not succeed, however, in attracting a sufficient number of white student participants to effect a racial balancing of the system. While much of the student movement prompted by the magnet program helped to reduce racial imbalance, a disproportionate amount of the overall movement was by black students.

6.7 During the 1975–78 school years, a disproportionate number of Seattle's black students were participating in Seattle's desegregation programs through their voluntary or mandatory transfer to schools outside their neighborhood.

6.8 Despite the existence of extensive voluntary, magnet, and mandatory middle school desegregation programs, racial imbalance in Seattle actually increased between the 1970–71 and 1977–78 school years. The Board, therefore, concluded that a voluntary student assignment plan, standing alone, without a mandatory assignment "backup," could not effect an acceptable racial balancing of the Seattle schools.

6.9 In June 1977 the Board, in Resolution 1977–8, defined "racial imbalance" as "the situation that exists when the combined minority student enrollment in a school exceeds the districtwide combined minority average by 20 percentage points, provided that the single minority enrollment (as defined by current federal categories) of no school will exceed 50 percent of the student body." The Board then resolved to eliminate minority racial imbalance in the public schools of Seattle by the 1979–80 school year. The Board also adopted Resolution 1977–9, which directed the formulation of an extensive planning and citizen involvement process to develop desegregation strategies.

6.10 On December 14, 1977, the Board adopted Resolution 1977–78 which selected the strategies to be used in eliminating Seattle's racial imbalance. On that same day the Board directed the school district administration to continue developing the desegregation plan, which came to be known as The Seattle Plan. This plan, for the 1978–79 school year, was adopted in March 1978.

6.11 A principal element of The Seattle Plan is the initial fixed assignment of entire neighborhoods of students to schools other than those geographically closest to their homes (their "neighborhood schools") for a portion of the students' K–12 school careers. The Seattle Plan contains significant voluntary assignment program options which are consistent with the Plan's racial balancing goals.

6.12 In taking action to effect a racial balancing of the Seattle schools, those members of the Board who voted to adopt the Plan were motivated by a number of considerations. Among those were their desire to carry out the oath of office which each took as a condition precedent to taking office, their desire to ward off threatened litigation, their desire to prevent the threatened loss of federal funds, their desire to relieve the black students of the disproportionate burden which they had borne in the voluntary efforts to balance the schools racially and their perception that racial balance in the schools promotes the attainment of equal educational opportunity and is beneficial in the preparation of all students for democratic citizenship regardless of their race.

6.13 Implementation of the first-year phase of the Seattle Plan's two year program has substantially reduced the number of racially imbalanced schools in the district and has substantially reduced the percentage of minority students in those schools which remain racially imbalanced.

6.14 Segregated housing patterns exist in the City of Seattle. These segregated housing patterns result in racially imbalanced schools when a neighborhood school assignment policy is implemented.

6.15 The Board intends to continue full implementation of The Seattle Plan to the extent permitted by law.

6.16 If Initiative 350 is implemented, it is probable that there would be significantly less black community support for and black student participation in any voluntary program for reducing racial imbalance in the Seattle schools.

7. *Circumstances Relating to Adoption of Initiative 350*

7.1 In December 1977, a group of Washington residents, who were opposed to the racial balancing strategies then being considered by the Seattle School Board, brought suit in King County Superior Court of the State of Washington (*Roe, et al. v. Seattle School District No. 1, et al.*, King County Superior Court Cause No. 838291) to enjoin the Board's anticipated adoption of The Seattle Plan. The application for injunction was denied by Superior Court Judge George H. Revelle on the morning of December 14, 1977; The Seattle Plan (Resolution 1977–28) was adopted that afternoon.

7.2 Subsequent to the Board's adoption of The Seattle Plan, the same citizens and others brought another state court suit (*Roe, et al. v. Seattle School District No. 1, et al.*, King County Superior Court Cause No. 839530) to enjoin the scheduled fall 1978 implementation of The Seattle Plan.

7.3 The individuals who brought these two injunctive actions and others began in December 1977 to call themselves Citizens for Voluntary Integration Committee ("CiVIC"). On January 16, 1978 they formally chartered Citizens for Voluntary Integration Committee with the State of Washington as a Washington nonprofit corporation pursuant to the provisions of RCW 24.03.

7.4 CiVIC was formed because of its founders' opposition to The Seattle Plan.

7.5 As part of the effort of CiVIC and persons acting with CiVIC to halt The Seattle Plan, CiVIC proposed an initiative for submission to the voters of the state at the 1978 general election.

7.6 Initiative 350 was patterned after previous federal legislative enactments, including the Esch Amendment, 20 U.S.C. § 1714(a), the Byrd Amendment, P.L. 94–206, § 209(90) Stat. 22), reenacted as P.L. 94–439, § 208 (90 Stat. 1434), and the Eagleton-Biden Amendment, P.L. 95–205 (91 Stat. 1460).

7.7 The purpose of these federal legislative enactments was to stop busing for school desegregation purposes except where constitutionally required.

7.8 Except for the assignment of students to effect racial balancing, the drafters of Initiative 350 attempted to preserve to school districts the maximum flexibility in the assignment of students.

7.9 Initiative 350 was developed as a response to racial balancing efforts in Seattle as embodied in The Seattle Plan.

7.10 For a time CiVIC adopted as its publicity and campaign slogan the expression "Ban the Plan," which referred to "banning" The Seattle Plan.

7.11 The District moved for summary judgment in the pending *Roe* actions in May 1978. Judge Howard granted the District's motion for summary judgment, dismissing all of plaintiffs' claims, and signed appropriate orders on June 21 and 26, 1978.

7.12 Several of the same persons who were plaintiffs in King County Cause Nos. 838291 and 839530 then filed suit (*Velikanje, et al. v. Seattle School District No. 1, et al.*) in July 1978 in Thurston County Superior Court of the State of Washington (Cause No. 78–2–00066–2) against the District and the Washington State Department of Ecology, praying that implementation of The Seattle Plan in the fall of 1978 be enjoined due to the District's failure, pursuant to a declaratory ruling from the Department of Ecology, to prepare an environmental impact statement (EIS) in connection with The Seattle Plan. This action is currently pending.

7.13 Prior to the November 7, 1978, election and pursuant to the provisions of RCW Ch. 29.81, the Secretary of State mailed to all registered voters in the State an official Voters' Pamphlet. That pamphlet contained the text of Initiative 350, an explanatory statement drafted by the Attorney General, and arguments by proponents and by opponents of the measure. In their arguments in the pamphlet for the initiative the proponents stressed, *inter alia*, the concepts of "forced busing" and the preservation of neighborhood schools. In their arguments the opponents stressed, *inter alia*, that the adoption of the initiative would rescind Seattle's desegregation plan and would significantly increase racial segregation in Seattle, Tacoma and Pasco.

7.14 The Voters' Pamphlet, the campaigns conducted by supporters and opponents of Initiative 350, newspaper editorials and articles, and other media coverage and publicity, made clear to the electorate that Initiative 350 would require dismantling of The Seattle Plan and would prohibit school district-directed assignment and transportation of students to other than their nearest or next nearest schools for the purpose of racially balancing public schools in the State.

7.15 During the election campaign on Initiative 350, CiVIC announced its own desegregation plan for Seattle. This plan is known as "THE CiVIC PLAN."

7.16 Initiative 350 allows voluntary desegregation, *i. e.*, the voluntary transfer assignment of students to schools away from their neighborhoods.

7.17 A part of the strategy utilized by CiVIC to terminate The Seattle Plan was to inform citizens outside the Seattle area about "the problems of mandatory busing" in Seattle.

7.18 During the campaign the proponents of Initiative 350 represented that there would be no loss of school district flexibility other than in busing for desegregation purposes.

7.19 During 1978 there were 300 school districts in the State of Washington. CiVIC campaign publicity supporting Initiative 350 and speeches given by CiVIC representatives during the election campaign assured people in school districts throughout the

state that "99% of the school districts in the state would not be affected by the passage of 350." Approximately one percent of the 300 school districts in the state *are* directly affected by Initiative 350. Those school districts are plaintiffs in this litigation: Pasco, Tacoma and Seattle.

7.20 Exhibit 58 contains CiVIC's legal analysis of the Initiative as published during the campaign by CiVIC. Exhibit 58, pp. 7–21, is a copy of two opinion letters from CiVIC's attorney. Component parts of Exhibit 58 were widely circulated by CiVIC during the election campaign.

7.21 Some proponents of Initiative 350 asserted The Seattle Plan would result in substantial "white flight" and thus make desegregation impossible in Seattle. They asserted voluntary desegregation programs under Initiative 350 would prevent "white flight" and thus promote desegregation.

7.22 The terms "busing," "forced busing" and "mandatory busing," in the context of Initiative 350 were synonymous with compulsory student school reassignment and transportation for racial balancing or desegregation purposes.

7.23 CiVIC campaign publicity supporting Initiative 350 made reference to the following: Initiative 350 and race issues [Exs. 47, 46]; "forced busing" causes greater segregation [Ex. 47, p. 1]; Seattle is not under a federal court order to desegregate [Ex. 47, p. 2; Exs. 59, 60]; "forced busing" to desegregate the public schools has not worked in other cities [Ex. 47, p. 2]; Initiative 350 "will eliminate" Seattle's "ability to use massive busing for desegregation purposes" [Ex. 51, p. 2]; Initiative 350 guarantees that state "funds are not used for forced busing of students based on racial identification" [Ex. 51, p. 5]; racial imbalance [Exs. 59, 60]; forced busing [Tr. 544, 662, 715, 801; Ex. 47, pp. 1, 3; Ex. 51, pp. 21, 24, 27; Ex. 52, p. 6; Exs. 53, 55, pp. 1–2; Ex. 56, pp. 2–4; Ex. 57, pp. 5–6, 8, 13, 15; Exs. 59, 60, 61, 62, 64, 65, 66, 67]; integration [Tr. 539; Exs. 61, 62, 64, 65, 67]; and segregation/desegregation [Tr. 539; Exs. 61, 62, 63, 64].

7.24 On November 7, 1978, Initiative 350 was approved by the voters by a margin of approximately 66 percent statewide.

7.25 In Seattle, the unofficial vote in favor of the measure was approximately 61 percent. In two Seattle Legislative Districts—Legislative District 37 and Legislative District 43—Initiative 350 failed. In Legislative District 37, where a majority of voters are racial minorities, the vote was approximately 61 percent against Initiative 350. In Legislative District 43, the vote was approximately 54 percent against the Initiative.

7.26 Initiative 350 would have taken effect as law in the State of Washington 30 days after the November 7 election, *i. e.*, on December 7, 1978 had not this litigation been initiated and a preliminary injunction issued.

7.27 The leadership of CiVIC has acted legally and responsibly in its advocacy of Initiative 350. In campaigning for the passage of Initiative 350 CiVIC has not directed its appeals to the racial biases of the voters.

7.28 It is clear from the location of school buildings and the attendance lines drawn around those buildings that the Seattle School District has traditionally adhered to a policy of the assignment of children to their neighborhood schools.

7.29 CiVIC, its agents and consultants deliberately took steps to avoid race becoming an issue in the campaign, since, they felt, its interjection into the campaign would have lost support for the initiative.

7.30 Many parents and voters who support neighborhood schools do so in a sincere belief in the value of neighborhood schools irrespective of the racial distribution of the students attending those schools.

7.31 A neighborhood school policy has certain advantages in that it facilitates community and parental input and support for educational and extracurricular programs; it minimizes safety hazards to children in reaching school; it reduces the cost of transportation; it eases the task of student assignment through the use of easily

determined standards; and it makes for better home-school communication.

7.32 Parents consider the quality and location of neighborhood schools an important factor when deciding whether or not to purchase, rent or lease a home in a given community.

7.33 Those voters who voted for Initiative 350 were not all motivated to do so by the same reason. Voters were motivated to do so by a number of reasons. It is impossible to ascertain all of those reasons nor to determine the relative impact of those reasons upon the electorate.

### 8. General Effects of Initiative 350 on Plaintiff School Districts

8.1 Implementation of Initiative 350 will compel those school districts which have adopted compulsory student assignment as a means of racially balancing their schools, to abandon all those efforts which cannot be accomplished by the transfer of students to their nearest or next nearest schools. Those school districts will in consequence become more racially imbalanced than they are at present.

8.2 If permitted to become law, Initiative 350 will remove from local school districts their existing authority under state law (declared in *Citizens Against Mandatory Bussing v. Palmason*, 80 Wash.2d 445, 495 P.2d 657 (1972)) to assign students to other than their nearest or next nearest schools in order to improve racial balance.

8.3 Except for racially-balancing purposes, Initiative 350 permits local school districts to assign students other than to their nearest or next nearest schools for most, if not all, of the major reasons for which students are at present assigned to schools other than their nearest or next nearest schools.

8.4 Section 3 of Initiative 350 lists seven tools or methods which educational authorities are specifically prohibited from utilizing to require attendance by students at schools other than their nearest or next nearest schools. Each of those seven tools or methods is an element of The Seattle Plan.

8.5 It would be impossible to effect a racial balance of Seattle schools without resort to some or all of the tools or methods prohibited by Section 3 of Initiative 350.

8.6 The seven tools or methods prohibited by Section 3 of Initiative 350 are commonly found in public school racial desegregation plans put into effect in this country during the past 25 years.

8.7 Section 6 of Initiative 350 requires a judicial declaration of duty to desegregate before a local school district may with assurance mandatorily reassign students to other than their nearest or next nearest schools for racial balancing purposes. No other aspect of mandatory student assignment is burdened with this requirement.

8.8 Except for the busing of students for racial balancing purposes, almost all of the busing of students currently taking place in this state is permitted by Initiative 350.

### 9. Effects of Initiative 350 on Pasco

9.1 Because of the housing patterns in Pasco, it is doubtful that the Pasco schools can be racially balanced within the "nearest or next nearest" restrictions of Initiative 350.

### 10. Effects of Initiative 350 on Tacoma

10.1 If implemented, Initiative 350 will make it impossible for Tacoma schools to maintain their present racial balance.

### 11. Effects of Initiative 350 on Seattle

11.1 If implemented, Initiative 350 will prevent the racial balancing of a significant number of Seattle schools and will cause the school system to become more racially imbalanced than it presently is.

11.2 If subject to the limitations of Initiative 350, the Seattle schools cannot attain the goal of racial balancing set by The Seattle Plan.

11.3 It is impossible at this time to know or to predict whether The Seattle Plan will cause more or less movement of white families from the Seattle School District than

would occur under Initiative 350. Under Initiative 350, however, there is certain to be movement of white parents away from those residential areas where there is a preponderance of minority families.

12. *Supplemental Findings*
(The numbers of these supplemental findings indicate the sections in which these findings should fall.)

3.1(a) The adverse effects of racially imbalanced schools fall most heavily upon minority students.

8.9 Initiative 350 does not permit a school board to assign students for the purpose of remedying *de jure* segregation in the absence of a court declaration or order requiring the board to do so.

8.10 Initiative 350 does not permit a local community which desires a racially-integrated educational experience for its students to cause students to be assigned to schools other than their nearest or next nearest schools in order to accomplish that purpose in the absence of a court declaration or order requiring the school board of that district to do so.

From the foregoing Findings of Fact, the Court draws the following:

## CONCLUSIONS OF LAW

1. The jurisdiction of this Court exists under United States Code Title 28, Sections 1331 and 1343.

2. This action presents questions of actual controversy between the parties involving substantial legal and constitutional issues as to the validity of Initiative 350.

■ 3. Initiative 350 is unconstitutional in that it denies equal protection of the laws to racial minorities in contravention of the Fourteenth Amendment to the United States Constitution in the following respects:

1. It creates an impermissible racial classification by forbidding mandatory student assignments for racial reasons while permitting such assignments for purposes unrelated to race. *Hunter v.*

*Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Lee v. Nyquist,* 318 F.Supp. 710 (W.D.N.Y.1970), aff'd 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971). No compelling state interest justifies that racial classification.

2. A racially discriminatory intent or purpose was one of the factors which motivated the adoption of the initiative. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Develop. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Personnel Administrator of Massachusetts v. Feeney,* 39 CCH S.Ct.Bull. 2918 (June 5, 1979).

3. It is overly inclusive in that it prohibits a school district from implementing a mandatory student assignment program even though the school district may be under a constitutional duty to eliminate segregation. *North Carolina Board of Education v. Swann,* 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Green v. County School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *San Francisco Unified Sch. Dist. v. Johnson,* 3 Cal.3d 937, 92 Cal. Rptr. 309, 479 P.2d 669 (1971).

4. Plaintiffs are entitled to a declaratory judgment declaring Initiative 350 to be unconstitutional.

5. Plaintiffs are entitled to a permanent injunction against the enforcement of the provisions of Initiative 350 by defendants or any of their instrumentalities, agents or employees.

## MEMORANDUM OPINION

I am filing this memorandum opinion in conjunction with my findings of fact and conclusions of law in order to spell out the reasoning behind my conclusions.

■ Although Initiative 350 was adopted by a referendum vote, it is clear that the sovereignty of the people is subject to constitutional limitations just as are legislative enactments. *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

For that reason the initiative is necessarily subject to the same scrutiny that it would be had it been adopted by the legislature.

After considering all of the evidence and all applicable law, I am compelled to find Initiative 350 unconstitutional upon several grounds: (1) it forbids mandatory student assignments for racial reasons but permits such student assignments for purposes unrelated to race, (2) a racially discriminatory purpose was one of the factors which caused Initiative 350 to be adopted, and (3) the initiative is overly inclusive in that it permits only court-ordered busing of students for racial purposes even though a school board may be under a constitutional duty to do so even in the absence of a court order.

In making the finding that the initiative is unconstitutional because it permits busing for non-racial reasons but forbids it for racial reasons, I rely primarily upon *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) and *Lee v. Nyquist*, 318 F.Supp. 710 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971).

In *Hunter* the electorate of the City of Akron amended the charter of that city to provide that any ordinance enacted by the city council dealing with racial, religious or ancestral discrimination in housing would not become effective unless approved by a majority of the city voters. The charter imposed this requirement of voter approval upon no other type of ordinance. The Supreme Court found this amendment to be a denial of the equal protection of the laws in that it created an explicitly racial classification by treating racial discrimination in housing differently from all other matters relating to housing. By making it more difficult for minorities to secure the enactment of an ordinance dealing with racial discrimination, the charter placed burdens upon racial minorities within the governmental process that it did not place upon other citizens. It hence denied to those minorities the equal protection of the laws.

In *Lee v. Nyquist* a three-judge court applied the *Hunter* rationale to strike down a New York statute which provided as follows:

"Except with the express approval of a board of education . . . a majority of the members of such board having been elected, no student shall be assigned or compelled to attend any school on account of race . . . ."

The court found that while the State Commissioner or Education had broad supervisory powers over local public education with regard to all matters affecting educational policy, the statute singled out for different treatment the assignment of students on account of race. The court stated at page 719:

"The statute thus creates a clearly racial classification, treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools."

The court added:

"We can conceive of no more compelling case for the application of the *Hunter* principle."

The provisions of Initiative 350 relevant to this opinion are as follows:

Section 1. . . . no school board . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence . . . except in the following instances:

(1) If a student requires special education, care or guidance . . .

(2) If there are health or safety hazards . . . or physical barriers or obstacles . . . between the student's place of residence and the nearest or next nearest school; or

(3) If the school nearest or next nearest to his place of residence is unfit or inadequate because of overcrowding, unsafe conditions or lack of physical facilities.

Section 3. For purposes of section 1 of this act "indirectly require any student to attend a school other than the school which is geographically nearest or next

nearest the student's place of residence . . . ," includes, but is not limited to, implementing, continuing, pursuing, maintaining or operating any plan involving (1) the redefining of attendance zones; (2) feeder schools; (3) the re-organization of the grade structure of the schools; (4) the pairing of schools; (5) the merging of schools; (6) the clustering of schools; or (7) any other combination of grade restructuring, pairing, merging or clustering: PROVIDED, That nothing in this chapter shall limit the authority of any school district to close school facilities.

Section 4. For the purposes of section 1 of this act, "special education, care or guidance" includes the education, care or guidance of students who are physically, mentally or emotionally handicapped.

Section 5. The prohibitions of this chapter shall not preclude the establishment of schools offering specialized or enriched educational programs which students may voluntarily choose to attend, or of any other voluntary option offered to students.

Section 6. This chapter shall not prevent any court of competent jurisdiction from adjudicating constitutional issues relating to the public schools.

Sections 1 and 4 of the initiative expressly provide that a school board may require a student to attend any school, even though not the one nearest or next nearest his place of residence, for a variety of reasons unrelated to race. A school board may require a student to attend whatever school it chooses if the student is in need of special education of any kind or if the student is suffering from any physical, mental, or emotional handicap or if there are health or safety hazards connected with his attending his nearest or next nearest school or if the nearest or next nearest school is inadequate by reason of overcrowding or the lack of physical facilities.

The foregoing reasons for mandatory student assignment comprise with one major exception the primary reasons that students are at the present time being assigned to schools other than their neighborhood schools. That one major exception is the assignment of students for racial balancing purposes. Student assignment for that purpose is not permitted by Initiative 350.

■ By omitting assignments for racial reasons from the list of permitted categories of student assignments, Initiative 350 effects implicitly the same type of racial classification which the New York statute in *Lee v. Nyquist* effected expressly.

Although the initiative does not explicitly disallow student assignment for racial reasons, as did the New York statute considered in *Lee v. Nyquist*, it achieves the same purpose by enumerating those purposes for which there may be student assignment and omitting from that enumeration the assignment of students in order to achieve racial balance. This is as effective a racial classification as is a statute which expressly forbids the assignment of students for racial balancing purposes. It is no less a denial of the equal protection of the law to minorities.

As a second ground for holding Initiative 350 to be unconstitutional, I find that a racially discriminatory purpose was one of the factors which motivated the conception and adoption of the initiative.

In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court held that a governmental action was not a denial of equal protection simply because that action had a racially disproportionate impact. For the action to be unconstitutional the Court held that there must be proof that there was in addition a racially discriminatory intent or purpose.

■ It is, of course, impossible to ascertain the subjective intent of those who enacted Initiative 350. It was a measure adopted by the electorate at the ballot box. Unlike the normal legislative enactment there were no committee hearings or floor debates to cast light upon the intent of the enactors.

I believe that I can safely assume that a great many voters were motivated solely by

a conviction that it was in the best interests of all children that they be permitted to attend their neighborhood schools; that there were many voters who were motivated solely by a desire to maintain as much racial separation as possible in the public schools; and that in between there were many voters who voted with varying degrees of mixed motives.

In deciding whether a racially discriminatory intent or purpose lay behind the adoption of Initiative 350, I cannot base my judgment upon what I believe I may "safely assume" as to the subjective intent of the voters. As to that subjective intent the secret ballot raises an impenetrable barrier.

The fact that it is impossible to determine whether there was subjectively a racially discriminatory intent or purpose does not, however, relieve this court of the burden of determining whether there was in fact such an intent or purpose behind the adoption of Initiative 350. One must simply look elsewhere than within the minds of the voters.

Two Supreme Court cases, *Village of Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and *Personnel Administrator of Massachusetts v. Feeney*, 39 CCH S.Ct.Bull. 2918 (June 5, 1979), give guidance to a court in determining in an objective fashion whether a discriminatory intent or purpose was a motivating factor in governmental action.

In *Arlington Heights* three black petitioners and a development corporation challenged a denial by the village of an application for the rezoning of a tract of land from a single-family to a multiple-family classification. The rezoning was assertedly to enable the developer to build a racially-integrated, low and moderate income housing project upon the land. In trying to determine whether there was a racially discriminatory intent in the denial of the application, the Court considered five factors:

a) The impact of the action, i. e., whether it bore more heavily upon one race than upon another;

b) The historical background of the decision;

c) The specific sequence of events leading to the decision;

d) The procedural and substantive departures from the norm in connection with the decision or action; and

e) The legislative or administrative history of the decision or action.

In considering these five factors, the Court found that the tract of land had been zoned for single-family residences since 1959 when the village first adopted its zoning map; that single-family homes surrounded the tract of land in question; that the village had always been committed to single-family homes as its dominant residential land use; that there had been no departure from normal procedure in the consideration of the application; and that the zoning denial did not appear substantively improper in light of all the information which was before the zoning board. Based upon a consideration of those factors, the Court held that no discriminatory intent or purpose had been demonstrated in the denial of the rezoning application.

In *Feeney* the Court again applied the *Arlington Heights* factors. In that case the Court upheld a veterans' preference law in Massachusetts that had been challenged on the ground that it discriminated against women. The Court examined the relevant legislative history and found that a veterans' preference was first declared by Massachusetts in 1884 and that from its inception the law established a preference for veterans over nonveterans, not a preference for men over women. The Court analyzed past legislative actions with respect to military service and found that veterans were overwhelmingly male largely because women had never been subject to a military draft. Given the sexual neutrality of the statutory history and the sexual one-sidedness of military service, the Court found that an intent to discriminate against women had not been a motivating factor in the enactment or extension of the veteran's preference law in Massachusetts and that it was in consequence not a denial of equal protection.

Examining Initiative 350 in light of the factors articulated by the Supreme Court in *Arlington Heights* and *Feeney*, one is led to the conclusion that a racially discriminatory purpose was in fact a motivating factor in the passage of Initiative 350.

■ The first consideration is that of the impact of the action. While it is true that a statute cannot be held unconstitutional solely because it has a racially disproportionate impact, the impact of the action must be weighed in determining whether there was discriminatory intent. Justice Stevens, in his concurring opinion in *Washington v. Davis*, observed at 426 U.S. page 253, 96 S.Ct. at page 2054:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds."

In *Feeney* the Court noted that discriminatory purpose implied more than an awareness of the consequences of one's actions but added that when adverse consequences of a law upon a minority are inevitable "a strong inference that the adverse effects were desired can reasonably be drawn." (n. 25, p. 2942)

It appears from the evidence that the overall education of students in a school system suffers when the schools of that system are racially imbalanced, that the greater the imbalance the greater the impairment and that there is a disproportionate impact upon the education of minority children when their schools are racially imbalanced.

Beyond question the informed voters of the state, and the voters in general in Seattle, were well aware that the passage of Initiative 350 would terminate the efforts which had been taken by school boards of the state to balance schools racially by the mandatory busing of students. Given the segregated housing patterns of the three plaintiff school districts, the termination of those efforts could only result in racially-imbalanced schools in those districts and a disproportionate impact upon minority students. This impact of Initiative 350 was a certainty, in marked contrast to the uncertain and speculative impact of the verbal skills test used to select police recruits in *Washington v. Davis* and the denial of the rezoning application in *Arlington Heights.*

The second and third factors utilized by the Court in *Arlington Heights* were the historical background of the decision and the specific sequence of events leading to the decision. In *Washington v. Davis, Arlington Heights* and *Feeney*, the Court examined all events surrounding the action in question: legislative enactments, board hearings, floor debates, and historical circumstances at the time each action was taken. In each of these situations, the Court found a race or gender-neutral pattern of conduct, with no evidence that would suggest a discriminatory purpose as a motivating factor in the decision-making process.

■ The same cannot be said with respect to the adoption of Initiative 350 inasmuch as it was conceived, drafted, advocated and adopted for the specific purpose of overriding the decision of the Seattle School Board to balance Seattle schools racially by means of student assignments. If implemented, the initiative will achieve that purpose. One must assume therefore that the voters, in adopting the initiative, intended to accomplish the very purpose for which the initiative was designed and intended therefore the disproportionate racial impact which its implementation will have.

The very words of the initiative reveal the intent to frustrate the plan of the Seattle School Board. Section 3 of the initiative expressly forbids the use of the entire panoply of tools or methods adopted by the board in its plan for racially balancing the Seattle schools. Except for voluntary student assignment options, Section 3 forbids every major, effective technique for achieving racial balance.

■ The historical background and sequence of events leading up to the adoption of the initiative reveals a whole series of

lawsuits and a recall election, the objective of which was to prevent the racial balancing of Seattle schools by means of mandatory student assignments. It reveals, too, that the adoption of the plan of racial balancing by the Seattle School Board was the event which gave rise to the thought of a statewide initiative as a means of thwarting that decision.

The court in *Arlington Heights* also considered procedural and substantive departures from the norm as factors bearing upon intent or purpose.

In the adoption of Initiative 350 there was a marked departure from the procedural norm in that an administrative decision of a subordinate local unit of government, the Seattle School Board, was overridden in a statewide initiative by voters, a great number of whom were entirely unaffected by that plan and who could not conceivably be affected by any plan for the mandatory assignment of students for racial balancing purposes.

It was also a marked departure from the norm, in terms of historical and current practices of local school districts, for the autonomy of school boards to be restricted relative to the assignment of students. Traditionally, student assignment has been a proper function of school boards. Local autonomy of school districts has long been recognized as a vital national tradition. *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Even the New York statute in *Lee v. Nyquist* did not attempt to proscribe the student assignment powers of elected school boards. Yet Initiative 350 reaches all school boards. This state preemption of local autonomy, when directed at racial concerns, is clearly a departure from prior state practice.

The racially disproportionate impact of the initiative when coupled with its historical background, the sequence of events leading to its adoption and the departure from the procedural norm demonstrate that a racially discriminatory intent or purpose was at least one motivating factor in the adoption of the initiative.

Even if Initiative 350 were not unconstitutional on its face and even if racially discriminatory purpose were not one of the motivating factors in its formation and purpose the initiative must still fall by reason of the breadth of its impact.

I find that Initiative 350 is overly inclusive in that it prohibits school assignments to achieve racial balance even in a school district where there is *de jure* segregation, that is, segregation caused by prior governmental action.

School boards of districts in which there is *de jure* segregation are charged with an affirmative duty to take whatever steps might be necessary to eliminate that segregation. *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). A statute which proscribes one of the means, if not the only means, of achieving that end must yield to constitutional requirements. *San Francisco Unified Sch. Dist. v. Johnson*, 3 Cal.3d 937, 92 Cal.Rptr. 309, 479 P.2d 669, 680 (1971).

Initiative 350 makes no provision for a school board which may have a constitutional obligation to remedy *de jure* segregation. The initiative proscribes a school board's use of student assignment in order to achieve racial balance under *any* circumstances. Any school board which is of the opinion that *de jure* segregation exists within its district is placed in the untenable position of being in violation of constitutional requirements or of being in violation of the prohibitions of Initiative 350. Its only recourse under the initiative is to initiate litigation in order to have a court declare the course of action that it should take.

Plaintiffs contend that Initiative 350 is violative of the Washington State Constitution. As to that contention, I make no finding.

Because Initiative 350 is violative of the United States Constitution, plaintiffs are entitled to a permanent injunction against

the enforcement of Initiative 350 by defendants, their instrumentalities, agents or employees.