**SEATTLE SCHOOL DISTRICT NO. 1 et al., Plaintiffs–Appellees,**

v.

**The STATE OF WASHINGTON et al., Defendants–Appellants.**

**Nos. 79–4643, 79–4655, 79–4676, 79–4740, 79–4801 and 79–4802.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 30, 1980.

Decided Dec. 16, 1980.

Camden M. Hall, Foster, Pepper & Riviera, Seattle, Wash., for Seattle School Dist.

Hall Baetz, Davis, Wright, Todd, Riese & Jones, et al., Seattle, Wash., for Pasco Neighborhood Council.

Slade Gorton, Atty. Gen. & Thomas F. Carr, Asst. Atty. Gen., Olympia, Wash., Michael W. Hoge, Seattle, Wash., for State of Washington.

Frederick Noland, MacDonald, Hoague & Bayless, Seattle, Wash., Robert J. Reinstein, Dept. of Justice, Washington, D.C., for Civ. Liberties.

Stew Cogan, Seattle, Wash., for Pasco Neighborhood Council.

Before ELY, WRIGHT and NELSON, Circuit Judges.

ELY, Circuit Judge:

This cause comes before the Court in an unusual posture. Local elected school authorities, who so often in the past in other jurisdictions have resisted court–ordered integration, have in this instance invoked the jurisdiction of the federal courts because their self–generated efforts to achieve racial balance in the public schools have been hindered by governmental action. Successful, locally–formulated public school desegregation programs in Washington are today threatened with extinction through enforcement of a Washington State statute by State officials.

The Seattle, Tacoma, and Pasco, Washington, school boards, in an effort to correct substantial racial imbalance in the public schools in those communities, have in recent years implemented a series of voluntary and mandatory desegregation programs. Because of persistently segregated residential housing patterns in the three metropolitan areas, these desegregation plans have necessarily entailed some assignment of students to schools other than those closest to their homes. The success of these programs has been manifest, and the "Seattle Plan" in particular has been hailed as a model for other large cities.

The continued efficacy of these programs became imperiled, however, in November 1978, when Washington voters adopted ballot Initiative 350 by a substantial statewide margin. Initiative 350 provides, in pertinent part, that:

no school board ... shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence ....

In November 1978, after the State threatened enforcement of Initiative 350, the three school districts filed a complaint in the District Court seeking a declaratory judgment that the statute was unconstitutional under the equal protection clause of the Fourteenth Amendment. In December 1978, prior to certification of Initiative 350 as a state law pursuant to Wash.Rev.Code § 29.62.130 (1974), the District Court issued a temporary restraining order barring enforcement. On February 9, 1979, the District Court issued a preliminary injunction continuing to block implementation of the statute and at the same time granted the motion of eight Washington public interest groups to intervene. Also on February 9, the District Court bifurcated the litigation. Phase I, from which this appeal is taken, was limited to the question of the constitutionality of Initiative 350. Phase II issues, which were not reached at trial because the District Court held that the statute violated the Fourteenth Amendment, derive from the intervenors' claim that the school districts operate unconstitutional dual school systems.

After an extended trial, District Judge Voorhees, on June 15, 1979, issued a Memorandum Opinion, together with Findings of Fact and Conclusions of Law, declaring Initiative 350 unconstitutional. *Seattle School Dist. No. 1 v. State of Washington*, 473 F.Supp. 996 (W.D.Wash.1979). He concluded that Initiative 350 was unconstitutional on three distinct grounds:

(1) it forbids mandatory student assignments for racial reasons but permits such student assignments for purposes unrelated to race, (2) a racially discriminatory

purpose was one of the factors which caused Initiative 350 to be adopted, and (3) the initiative is overly inclusive in that it permits only court–ordered busing of students for racial purposes even though a school board may be under a constitutional duty to do so even in the absence of a court order.

473 F.Supp. at 1012.

On August 29, 1979, the District Court issued a final order declaring Initiative 350 unconstitutional and permanently enjoining its enforcement. Also on August 29, the District Court issued a separate order denying the school districts' and intervenors' separate motions for attorney's fees.

■■■ Appellants, the State of Washington and various state officials, appeal from the District Court judgment declaring Initiative 350 unconstitutional. Appellees, the three Washington school districts and intervenors, cross–appeal from the order denying their motion for attorney's fees.

One of the intervening appellees, East Pasco Neighborhood Council, also cross–appeals from the denial of its motion that the Pasco School District be dismissed as a plaintiff.[1] The United States appeared, and continues to appear, as an *intervenor* in support of the plaintiffs-appellees.

### I. *Constitutionally of Initiative 350—The Appeal*

■■■ We find it unnecessary to discuss the District Court's holding that Initiative 350 was motivated by a discriminatory purpose and is unconstitutionally overbroad because we conclude that the statute was correctly struck down as an impermissible legislative classification based on racial criteria. *Hunter v. Erickson*, 393 U.S. 385, 391–93, 89 S.Ct. 557, 560–61, 21 L.Ed.2d 616 (1969); *Lee v. Nyquist*, 318 F.Supp. 710, 718–20 (W.D.N.Y.1970), aff'd, 402 U S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971).

---

**1.** The Council raises a threshold jurisdictional question, arguing that because the State has not threatened to enforce Initiative 350 against Pasco School District ("Pasco"), it does not have standing to challenge the statute under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1979). We disagree. It is true that claims alleging the unconstitutionality of a statute are normally non–justiciable in the absence of immediate threatened prosecution. *Poe v. Ullman*, 367 U.S. 497, 501–09, 81 S.Ct. 1752, 1754–59, 6 L.Ed.2d 989 (1961). Nevertheless, if the circumstances of the dispute provide sufficient guarantees that a genuine case or controversy exists, a federal court may assume jurisdiction even in the absence of a direct threat of enforcement against the plaintiff. *See Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297–305, 99 S.Ct. 2301, 2308–12, 60 L.Ed.2d 895 (1979); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682–84, 97 S.Ct. 2010, 2014–15, 52 L.Ed.2d 675 (1977); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 136–48, 95 S.Ct. 335, 354–61, 42 L.Ed.2d 320 (1974); *Steffel v. Thompson*, 415 U.S. 452, 458–60, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974); *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 504–08, 92 S.Ct. 1749, 1754–56, 32 L.Ed.2d 257 (1972); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

In this case, four factors indicate that an actual case or controversy exists between Pasco and the State despite the absence of a specific threat, as against Pasco, to enforce Initiative 350. First, this is a highly specific statute, clearly applicable to Pasco's student assignment policies. *See Doe v. Bolton*, 410 U.S. 179 at 187–89, 93 S.Ct. 739 at 745 46, 35 L.Ed.2d 201; *Crossen v. Breckenridge*, 446 F.2d 833, 838 (6th Cir. 1971). Second, Initiative 350 is a recent statutory enactment and not a law which has lain moribund for years. *See Poe v. Ullman*, 367 U.S. at 501, 81 S.Ct. at 1754; *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1, 12 (9th Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (Browning, J., dissenting). Third, there have been immediate threats of enforcement against parties whose legal status under Initiative 350 is identical to that of Pasco, *i. e.,* the Seattle and Tacoma School Districts. *See Steffel v. Thompson*, 415 U.S. at 459, 94 S.Ct. at 1215 (prosecution of plaintiff's companion); *Carey v. Population Servs. Int'l*, 431 U.S. at 684 n.3, 97 S.Ct. at 2015 n.3 (prosecution under predecessor statute). Fourth, because this is a civil rather than a criminal statute, it imposes an affirmative duty to comply. "[I]f appell[ees] are now under such an obligation, that in and of itself makes their attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion," *Lake Carriers Ass'n v. MacMullan*, 406 U.S. at 507, 92 S.Ct. at 1755 at least where there is an indication, as in this case, that the statute will be enforced in the future. *Id. See also Independent Bankers Ass'n v. Heimann*, 613 F.2d at 1164, 1167 (D.C.Cir.1979); *Southern Pac. Transp. Co. v. Redden*, 458 F.Supp. 593, 599–60 (D.Or.1978).

We note at the outset the operative legal and political effect of Initiative 350. As the District Court below said, the statute "was conceived, drafted, advocated and adopted for the specific purpose of overriding the decision of the Seattle School Board to balance Seattle schools racially by means of student assignments." 473 F.Supp. at 1015.[2] We agree with the District Court that

[a]lthough the initiative does not explicitly disallow student assignment for racial reasons, as did the New York statute considered in *Lee v. Nyquist*, it achieves the same purpose by enumerating those purposes for which there may be student assignment and omitting from that enumeration the assignment of students in order to achieve racial balance. This is as effective a racial classification as is a statute which expressly forbids the assignment of students for racial balancing purposes.

*Id.* at 1013.[3] Initiative 350 embodies a constitutionally–suspect classification based on racial criteria because it legislatively differ-

2. Judge Voorhees' Finding of Fact No. 8.2 was that "Initiative 350 will remove from local school districts their existing authority under state law ... to assign students to other than their nearest or next nearest schools in order to improve racial balance." 473 F.2d at 1010 (*citing Citizens Against Mandatory Bussing v. Palmason*, 80 Wash.2d 445, 495 P.2d 657 (1972) (en banc)). This finding is supported by the evidence and the conclusion is not clearly erroneous. Fed.R.Civ.P. 52(a).

3. Initiative 350 provides in its entirety as follows:

*Section 1. Notwithstanding any other provision of law, after the effective date of this act no school board, school district, educational service district board, educational service district, or county committee, nor the superintendent of public instruction, nor the state board of education, nor any of their respective employees, agents or delegates shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence within the school district of his or her residence and which offers the course of study pursued by such student, except in the following instances:*

*(1) If a student requires special education, care or guidance, he may be assigned and transported to the school offering courses and facilities for such special education, care or guidance;*

*(2) If there are health or safety hazards, either natural or man made, or physical barriers or obstacles, either natural or man made, between the student's place of residence and the nearest or next nearest school; or*

*(3) If the school nearest or next nearest to his place of residence is unfit or inadequate because of overcrowding, unsafe conditions or lack of physical facilities.*

*Section 2. In every such instance where a student is assigned and transported to a school other than the one nearest his place of residence, he shall be assigned and transport-*

ed to the next geographically nearest school with the necessary and applicable courses and facilities within the school district of his or her residence.

*Section 3. For purposes of section 1 of this act, "indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence within the school district of his or her residence and which offers the course of study pursued by such student" includes, but is not limited to, implementing, continuing, pursuing, maintaining or operating any plan involving (1) the redefining of attendance zones; (2) feeder schools; (3) the reorganization of the grade structure of the schools; (4) the pairing of schools; (5) the merging of schools; (6) the clustering of schools; or (7) any other combination of grade restructuring, pairing, merging or clustering: PROVIDED, That nothing in this chapter shall limit the authority of any school district to close school facilities.*

*Section 4. For the purposes of section 1 of this act "special education, care or guidance" includes the education, care or guidance of students who are physically, mentally or emotionally handicapped.*

*Section 5. The prohibitions of this chapter shall not preclude the establishment of schools offering specialized or enriched educational programs which students may voluntarily choose to attend, or of any other voluntary option offered to students.*

*Section 6. This chapter shall not prevent any court of competent jurisdiction from adjudicating constitutional issues relating to the public schools.*

*Section 7. Sections 1 through 6 of this act are added to chapter 223, Laws of 1969 ex. sess. and shall constitute a new chapter in Title 28A RCW.*

*Section 8. If any provision of this act, or its application to any person or circumstance is held invalid, the remainder of the act, or the application of the provision to other persons or circumstances is not affected.*

entiates student assignment for purposes of achieving racial balance from student assignment for any other significant reason.[4]

The constitutional framework established in *Hunter v. Erickson* and *Lee v. Nyquist* dictates that Initiative 350 must fall. In *Hunter*, the Supreme Court invalidated an amendment to the Akron City charter requiring that any fair housing ordinance passed by the city council be approved by a majority of the city voters prior to becoming law. The Court struck down the amendment on equal protection grounds because it created "an explicitly racial classification treating racial housing matters differently from other racial and housing matters." 393 U.S. at 389, 89 S.Ct. at 559.

The Court in *Hunter* also noted that the amendment "not only suspended the operation of the existing ordinance forbidding housing discrimination," but also restructured the existing political process to require the approval of the electorate before any future ordinance could take effect. *Id.* at 389–90, 89 S.Ct. at 559–60. By so altering the governmental structure on matters concerning a racial distinction, making it more difficult for minorities to secure favorable legislation, the amendment placed unconstitutional "special burdens on racial minorities within the governmental process." *Id.* at 391, 89 S.Ct. at 560. We agree that "[t]he principle of *Hunter* is that the state creates an 'explicitly racial classification' whenever it differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area." *Lee v. Nyquist*, 318 F.Supp. at 718.

In *Lee*, a three–judge district court applied *Hunter* to strike down a New York statute that prohibited racially–conscious student assignment by appointed school boards, but not by elected boards. The statute was unconstitutional, the court said, because it "creates a clearly racial classification, treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools." 318 F.Supp. at 719.

Applying these principles here, it is manifest that Initiative 350 both creates a constitutionally–suspect racial classification and radically restructures the political process of Washington by allowing a state–wide majority to usurp traditional local authority over local school board educational policies. Initiative 350 implicitly effects precisely the same classification which was made explicit in *Lee*; the law treats a single purpose for student assignment, racial balancing, differently from all others. Though Initiative 350 creates the differential classification indirectly by omission, there is no basis for distinguishing it as a matter of constitutional law from the explicit classifications of *Hunter* and *Lee*. Unless this Court affirms the relevancy of the constitutional analysis applied in *Hunter* and *Lee* to this case, the guarantee of equal protection of laws will become a hollow shell. Lawmakers who seek to establish impermissible racial classifications will in the future be able to achieve, by artfully worded statutes like Initiative 350, constitutionally forbidden goals.

■ The racial classification embodied in the statute is invalid unless it is the least drastic means required to achieve a compelling state interest. *McLaughlin v. Florida*, 379 U.S. 184, 192–96, 85 S.Ct. 283, 288–90,

---

4. Judge Voorhees' Finding of Fact No. 8.3 was that "[e]xcept for racially–balancing purposes, Initiative 350 permits local school districts to assign students other than to their nearest or next nearest schools for most, if not all, of the major reasons for which students are at present assigned to schools other than their nearest or next nearest schools." 473 F.Supp. at 1010.

That the statute does not contain an explicit racial classification is of no consequence if the law is not neutral. In *Personnel Adm'r of*

*Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court clearly indicated that "[i]f the [challenged statutory] classification itself, *covert or overt*, is *not* based upon gender, the *second question* is whether the adverse effect reflects invidious gender–based discrimination." *Id.* at 274, 99 S.Ct. at 2293 (emphasis added). Because, as discussed above, Initiative 350 contains a covert racial classification, it is not a neutral law and the disparate impact analysis does not apply.

13 L.Ed.2d 222 (1964). *See Hunter v. Erickson*, 393 U.S. at 391–93, 89 S.Ct. at 560–61; *Lee v. Nyquist*, 318 F.Supp. at 720. We have no reason to dispute the District Court's finding that the legislative purpose of Initiative 350 was to restore the Seattle School District's traditional policy of assigning students to their neighborhood schools.[5] However, while "[a] neighborhood school policy is not constitutionally suspect," *Diaz v. San Jose Unified School Dist.*, 612 F.2d 411, 415 (9th Cir. 1979), it is the locally elected school authorities who "are traditionally charged with broad power to formulate and implement educational policy." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Locally elected school boards even possess "broad discretionary powers" to prescribe a fixed proportion of racial mix in each school as an educational policy. *Id.*

In fact, the Supreme Court struck down a North Carolina statute that flatly prohibited the assignment of any public school student on account of race or for the purpose of creating a racial balance in the schools in *North Carolina Bd. of Educ. v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).[6] There, the Court reiterated that

> as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable *quite apart from any constitutional requirements....* [I]f a state–imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall ....

*Id.* at 45, 91 S.Ct. at 1285 (emphasis added).

That the Seattle Plan was self–imposed and not required as a remedial measure by a federal district court[7] does not alter or enhance the significance of Washington State's interest in mandating a state–wide neighborhood school policy.[8] As the three–

---

**5.** Judge Voorhees' Finding of Fact No. 7.28 was that "the Seattle School District has traditionally adhered to a policy of the assignment of children to their neighborhood schools." 473 F.Supp. at 1009.

**6.** The *anti busing law*, the Court said, was invalid because it "would inescapably operate to obstruct the remedies granted by the District Court" to eliminate the existing dual school system created by an unconstitutional background of *de jure* segregation. 402 U.S. at 45, 91 S.Ct. at 1285.

In *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), the Supreme Court emphasized the importance of local control over education. Local autonomy and diversity are so important to public education, the Court held in *Milliken*, that judicial desegregation remedies could not exceed the geographical scope of the constitutional violation:

> [T]he notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country. *No single tradition in public education is more deeply rooted than local control over the operation of schools*; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process....  Thus, in *San Antonio School District v. Rodriguez*, 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973), we observed that local control over the educa-

tional process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence."

418 U.S. at 741 -42, 94 S.Ct. at 3125 (citations omitted) (emphasis added). *See also Wright v. Council of City of Emporia*, 407 U.S. 451, 469, 92 S.Ct. 2196, 2206, 33 L.Ed.2d 51 (1972) ("Direct control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society ...."); *Brown v. Bd. of Educ.*, 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955) (*Brown II*) (school authorities "have the primary responsibility for elucidating, assessing, and solving" varied local school problems engendered by race); *Martin v. Charlotte Mecklenburg Bd. of Educ.*, 626 F.2d 1165, 1167 (4th Cir. 1980); note 9 *infra*.

**7.** The District Court did not reach the question of whether the school districts were under a constitutional duty to desegregate. The District Court bifurcated the litigation, and the intervenors' claims that the school districts operate unconstitutional dual school systems were not addressed in Stage I.

**8.** Had a successor school board to the one that adopted the Seattle Plan -instead of the state electorate as a whole· attempted to repeal or rescind the self imposed student assignment plan, we would be faced with a quite different issue. In *Dayton Bd. of Educ. v. Brinkman*, 433

judge panel observed in *Lee v. Nyquist*, a finding of *de jure* segregation is irrelevant when majoritarian political processes are used to frustrate minority participation:

> The statute places *burdens* on the implementation of educational policies designed to deal with race on the local level.
>
> . . . The . . . Legislature has acted to make it more difficult for racial minorities to achieve goals that are in their interest.
>
> The statute thus operates to disadvantage a minority, a racial minority, in the political process. There can be no sufficient justification supporting the necessity of such a course of action.

318 F.Supp. at 719–20. *See also Flores v. Pierce*, 617 F.2d 1386, 1391 (9th Cir. 1980).

The State's argument that *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 413–14, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (*Dayton I*), permits official rescission of previously adopted desegregation measures as long as there was no antecedent constitutional duty to remedy *de jure* segregation ignores the crucial fact that a different governmental body–the state–wide electorate–rescinded a policy voluntarily enacted by locally elected school boards already subject to local political control. Initiative 350, unlike the situation in *Dayton I*, results in the political process being skewed at the

expense of local representative bodies and their constituencies. *See* note 8, *supra*.

█ The opponents of desegregation who reside in the Seattle School District resorted to the state–wide initiative mechanism only after unsuccessful attempts to recall four elected school board members in 1971–72, *see* Finding of Fact No. 6.3, 473 F.Supp. at 1006, and to block the Seattle Plan in the courts, *see* Findings of Fact Nos. 7.1, 7.2, and 7.11, 473 F.Supp. at 1007–08. The effect of Initiative 350 is to restructure the state's political and administrative process so as to *remove* from local school boards their existing authority, and in large part their capability,[9] to enact programs designed to desegregate the schools. Initiative 350 effectively disenfranchises the voters of the local school districts with respect to local educational matters. The interest of the State of Washington in mandating a state–wide policy of neighborhood schools must, in these circumstances, fall to the paramount interest of the locally elected school boards and the community they represent in promulgating their own educational policy. Therefore, we hold that Initiative 350, which attempts to wrest from local control the formulation and implementation of educational and desegregation policies, is not supported by any compelling state interest; consequently, the statute is unconstitutional as a violation of the equal

---

U.S. 406, 413 14, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (*Dayton I*), the Court discussed a school board's rescission of a previously adopted resolution which it was under no constitutional duty to promulgate--affecting the assignment of pupils:

> The Board had not acted to undo operative regulations affecting the assignment of pupils or other aspects of the management of school affairs, cf. *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), but simply repudiated a resolution of a predecessor Board stating that it recognized its own fault in not taking affirmative action at an earlier date. We agree with the Court of Appeals' treatment of this action, wherein that court said:
>
>> The question of whether a rescission of previous Board action is in and of itself a violation of appellants' constitutional rights is inextricably bound up with the question of whether the Board was under a constitution-

al duty to take the action it initially took. . . . If the Board was not under such a duty, then the rescission of the initial action in and of itself cannot be a constitutional violation. (*Quoting Brinkman v. Gilligan*, 503 F.2d 684, 697 (6th Cir. 1974) (citations omitted)). *Accord, Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 531 n.5, 99 S.Ct. 2971, 2976 n.5, 61 L.Ed.2d 720 (1979) (*Dayton II*). Under this standard, the constitutionality of Initiative 350 would hinge on the Stage II determination of whether the Seattle School District has maintained a dual system or practiced *de jure* segregation.

9. Judge Voorhees' Finding of Fact No. 8.5 was that "[i]t would be impossible to effect a racial balance of Seattle schools without resort to some or all of the tools or methods prohibited by Section 3 of Initiative 350", 473 F.Supp. at 1010. This holding is not clearly erroneous. Fed.R.Civ.P. 52(a).

protection clause of the Fourteenth Amendment.[10] *See Hunter v. Erickson*, 393 U.S. at 393, 89 S.Ct. at 561 ("the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size."); *Lee v. Nyquist*, 318 F.Supp. at 720.

The appellants contend that *Brown v. Califano*, 627 F.2d 1221 (D.C.Cir.1980) should control the outcome here. We disagree. In *Brown*, the D.C. Circuit upheld the constitutionality of a series of amendments to congressional appropriations bills which prevent the Department of Health, Education, and Welfare from withholding federal funds from school districts which subscribe to a neighborhood school student assignment policy. The Eagleton–Biden amendment, typical of the challenged provisions, provides that

> [n]one of the funds contained in this Act shall be used to require, directly or indirectly, the transportation of any student to a school other than the school which is nearest the student's home [except for a student requiring special education], . . . in order to comply with Title VI of the Civil Rights Act of 1964.

*Quoted in Brown v. Califano*, 627 F.2d at 1226 n.26.

*Brown* is distinguishable in a number of fundamental respects. Although the statutory language of Initiative 350 and the Eagleton–Biden amendment are superficially similar, the operative and intended effects of the statutes are vastly different. The Title VI amendments were merely an internal administrative housekeeping measure designed to limit HEW's ability to order mandatory busing. The legislative history indicates that Congress simply intended to prevent the HEW bureaucracy from acting solely on its own authority in administrative proceedings to coerce local school districts into adopting busing plans. "An explicit, major purpose of the amendments was to take 'HEW out of the busing business.' In other words, Congress wanted to ensure that mandatory busing orders derive either from local school officials or federal courts." *Id.* at 1231, *quoting* 122 Cong.Rec. 21198 (1976) (remarks of Sen. Biden) (footnotes omitted). Judge Bazelon noted that:

> the instant case does not *involve a flat prohibition against involuntary busing*. The amendments challenged here merely restrict one federal agency's ability to induce busing as a condition of receiving federal funds. *Local school officials still may voluntarily employ transportation to desegregate . . . . [A]ll reasonable desegregation methods remain available to school officials and to courts.*

627 F.2d at 1229 (emphasis added) (footnote omitted).

Here, Initiative 350 flatly prohibits local officials from busing beyond neighborhood schools if the purpose is to desegregate the schools. Busing beyond neighborhood schools for all other significant reasons is permitted. This is significantly different from the amendments, which the *Brown* court concluded did not "make [a] classification along impermissible [racial] lines." *Id.* at 1230. Because Initiative 350 *does* preclude local school authorities from voluntarily busing to achieve desegregation, and does so via a statute that embodies a burdensome racial classification, *Brown v. Califano* is inapposite.

Therefore, for the reasons stated herein, the judgment of the District Court that Initiative 350 is unconstitutional is affirmed.

## II. *Attorney's Fees–The Cross–Appeal*

After the decision on the merits, the appellees requested attorney's fees as authorized by two statutes. The Civil Rights

---

**10.** *Cf. Associated Gen. Contractors v. San Francisco Unified School Dist.*, 616 F.2d 1381, 1388 90 (9th Cir. 1980), *cert. denied sub nom. National Ass'n of Minority Contractors v. Associated Gen. Contractors,* —— U.S. ——, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980) (state's interest in lowest–bid contracting policy governing *employment* in publicly funded construction projects is paramount to school board's *non-educational* interest in voluntarily adopting a minority set–aside affirmative action program).

Attorney's Fees Award Act of 1976 provides, in pertinent part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title ... or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of ... title VI of the Civil Rights Act of 1964, the court, *in its discretion*, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988 (1980) (emphasis added). Section 718 of the Emergency School Aid Act also provides that:

> Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this subchapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, *in its discretion*, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fees as part of the costs.

20 U.S.C. § 3205 (1980) (emphasis added). The District Court denied the motions, and appellees cross–appealed for review of that judgment.

■ The general attorney's fees statute, § 1988, and the statute dealing specifically with school desegregation cases, § 3205, share the same language and are to be construed together. *Wheeler v. Durham City Bd. of Educ.*, 585 F.2d 618, 621–22 (4th Cir. 1978); *see Northcross v. Memphis Bd. of Educ.*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam). The Supreme Court has interpreted these statutes as requiring that "the successful plaintiff 'should ordinarily recover an attorney's fee *unless* special circumstances would render

such an award *unjust.*'" *Northcross v. Memphis Bd. of Educ.*, 412 U.S. at 428, 93 S.Ct. at 2202, *quoting Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). Our Court has examined two factors in determining if a case involves "special circumstances" which would make an award "unjust": (1) whether allowing attorney's fees in a particular case would further the congressional purpose in adopting the Acts, and (2) the balance of equities. *See Dennis v. Chang*, 611 F.2d 1302 (9th Cir. 1980); *Aho v. Clark*, 608 F.2d 365 (9th Cir. 1979); *Buxton v. Patel*, 595 F.2d 1182 (9th Cir. 1979).

■ The congressional purpose in providing attorney's fees in civil rights cases was to eliminate financial barriers to the vindication of constitutional rights and to stimulate voluntary compliance with the law. S.Rep.No.1011, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Ad.News, p. 5908; H.R.Rep.No.1558, 94th Cong., 2d Sess. (1976).

■ The District Court concluded that an award of attorney's fees in this case was not necessary because the school districts are publicly–funded entities. There is nothing in the language or legislative history of the statutes, however, indicating a congressional intent to limit attorney's fees to private parties. As long as a publicly–funded organization advances important constitutional values, it is eligible for fees under the statutes. *Dennis v. Chang*, 611 F.2d at 1304–07; *Oldham v. Ehrlich*, 617 F.2d 163, 168–69 (8th Cir. 1980); *Palmigiano v. Garrahy*, 616 F.2d 598, 600–03 (1st Cir. 1980). *See Holley v. Lavine*, 605 F.2d 638 (2d Cir. 1979), *cert. denied sub nom. Blum v. Holley*, 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980); *Weisenberg v. Huecker*, 593 F.2d 49 (6th Cir.), *cert. denied*, 444 U.S. 880, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978) (allowing awards to publicly–funded legal services corporations).

■ The State argues that even if a publicly–funded entity is eligible to receive le-

gal fees under the statutes, an award would be inappropriate in this case because the "special circumstance" of an absence of bad faith on the part of the state officials makes an award in this case "unjust." While absence of bad motives precludes an award against named defendants in their individual capacities, *Hutto v. Finney*, 437 U.S. 678, 693–700, 98 S.Ct. 2565, 2574–78, 57 L.Ed.2d 522 (1978), it does not bar an award against the state or named individuals in their official capacities. *Williams v. Alioto*, 625 F.2d 845 (9th Cir. 1980); *Universal Amusement Co. v. Hofheinz*, 616 F.2d 202, 204 n.1 (5th Cir. 1980); *Internal Oceanic Enterprises, Inc. v. Menton*, 614 F.2d 502, 504 (5th Cir. 1980); *Johnson v. State of Mississippi*, 606 F.2d 635, 637 (5th Cir. 1979); *Haycraft v. Hollenbach*, 606 F.2d 128, 132 (6th Cir. 1979).

After full consideration of the facts in this case, we conclude that the District Court abused its discretion in denying the school districts' motion for attorney's fees. The judgment on this issue is reversed and the cause remanded for the purpose of determining the amount of the award.

The District Court also denied intervening appellees' separate motion for attorney's fees, not, as the State suggests, because intervenors could not be included in the statutory category of "prevailing parties," but rather because they played a *de minimis* role in the trial on the merits. After examining the record, we conclude that the District Court was within its discretion in denying intervenors' motion inasmuch as the request was conditioned on their level of participation in the Phase I litigation. Intervenors, however, also necessarily devoted substantial time and effort to preparation for trial on the Phase II issues. This pre–trial preparation was essential because it was apparent from the onset of this case that the school districts would not be in a position to argue they were operating dual school systems if Initiative 350 were found to be constitutional. The burden of litigating the Phase II issues would have been the sole responsibility of the intervenors.

An award of attorney's fees for time spent on a particular issue is not precluded merely because developments in the course of the litigation make it unnecessary to consider that specific question. "Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues ...." *Maher v. Gagne*, —— U.S. ——, ——, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980). *Accord, Williams v. Alioto*, 625 F.2d at 848. The legislative policy of encouraging constitutional litigation, which led Congress to specify that an award is permissible for an issue which is not fully litigated if constitutional rights are vindicated through the mechanism of a consent decree or other preliminary relief, S.Rep.No.1011 at 5, [1976] U.S. Code Cong. & Ad.News at 5912–13, also supports an award for expenses incurred in the preparation of issues which were not reached if the same constitutional values are advanced through resolution of another claim. *See Northcross v. Board of Educ. of Memphis*, 611 F.2d 624, 635–36 (6th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *Brown v. Bathke*, 588 F.2d 634, 637–38 (8th Cir. 1978); *Busche v. Burkee*, 483 F.Supp. 1326, 1328 (E.D.Wis.1980). In the analogous situation in which resolution of a non–fee claim makes consideration of a fee claim unnecessary, the court in its discretion may allow an award. *Maher v. Gagne*, 100 S.Ct. at 2576 & n.15; *Oldham v. Ehrlich*, 617 F.2d at 168; *Kimbrough v. Arkansas Activities Ass'n*, 574 F.2d 423, 426–27 (8th Cir. 1978).

School desegregation cases invariably involve multiple parties and multiple issues. It is usually impossible to determine in advance of trial which issues will be reached or which parties will play pivotal roles in the course of the litigation. To retrospectively deny attorney's fees because an issue is not considered or because a party's participation proves unnecessary would have the effect of discouraging the intervention of what in future cases may be essential parties. "The complex nature of school desegregation cases requires that attorneys' fees be approached with flexibility

if Congress' goal in enacting these statutes is to be realized." *United States v. Waterbury Bd. of Educ.*, 605 F.2d 573, 576 (2d Cir. 1979).

In this case there was a substantial likelihood that Initiative 350 would be held constitutional. In that event the considerable burden of litigating whether the school districts involved were unconstitutionally segregated would have fallen squarely on the intervenors. Because an award of attorney's fees in this case is essential to effectuate the congressional purpose of encouraging future constitutional litigation in similar circumstances, we conclude that the District Court abused its discretion in denying intervenors' attorney's fees.

The judgment on this issue is reversed and upon remand, the District Court will determine the amount of the award. The award should include not only compensation for time spent on the Phase II issues, but at least some award for time spent monitoring the Phase I litigation. The intervenors could not have effectively litigated Phase II issues if they had not had at least some familiarity with the proceedings on Phase I issues.

Affirmed in part; reversed and remanded in part.

EUGENE A. WRIGHT, Circuit Judge, dissenting:

The issue in this appeal is whether Initiative 350 violates the Fourteenth Amendment. The initiative was adopted overwhelmingly, passing in each of the 39 counties, and had a statewide affirmative vote in excess of 65%. By enacting the law, Washington's voters chose to adopt a neighborhood schools policy, and to limit the use of mandatory busing as a means of desegregating schools.

It is not our function to assess the wisdom of that choice. We must decide only whether the choice was constitutionally permissible.

We need not determine at this stage of the litigation whether Seattle or any Washington school district operates or maintains a *de jure* segregated school system. The initiative expressly refrains from interfering with constitutionally mandated remedial actions. To date, no court has said that any Washington district operates a dual system.

In the absence of a duty to desegregate, I find no constitutional barrier to the voters' adoption of a neighborhood schools policy. Although the choice made by the voters may have been controversial, it was not one they were precluded from making.

The district court held Initiative 350 unconstitutional on three alternative grounds. The majority, adopting one of the district court's arguments, holds that, because the initiative contains a racial classification which is not necessary to achieve a compelling state interest, it is unconstitutional. After considering the majority's analysis, I shall add my views as to the other two grounds articulated by the district court.

I

The majority finds a racial classification in Initiative 350 because it prohibits student assignments beyond the next nearest school in order to obtain racially balanced schools, but allows such assignments for other reasons. It relies on *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and *Lee v. Nyquist*, 318 F.Supp. 710 (W.D. N.Y.1970), *aff'd*, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971), for the proposition that the state creates an "explicit racial classification" insofar as it "differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area." Maj. op. at 1344.

Finding a racial classification, the majority perceives no need to inquire into the purpose or intent behind Initiative 350. Instead, it proceeds immediately to the question whether the classification is necessary to achieve a compelling state interest.

Although recognizing a state interest in a neighborhood schools policy, the majority finds that interest subordinate to the interest of local communities in promulgating their own educational policies for public

schools. It concludes the state's interest in neighborhood schools is not compelling and thus the initiative is unconstitutional.

## A

In its recent decisions, the Supreme Court has emphasized that the touchstone of an equal protection violation is an intent to discriminate, *i. e.*, an intent to treat similarly situated persons differently.

In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court affirmed the central purpose of the equal protection clause is to prevent discrimination based on race. *Id.* at 239, 96 S.Ct. at 2047. It emphasized, however, that "a racially discriminatory purpose" was an essential element of an equal protection violation. *Id.* The Court specifically noted the application of this principle in school desegregation cases:

> The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and predominantly white schools in a community is not alone violative of the Equal Protection Clause. The essential element of *de jure* segregation is "a current condition of segregation resulting from intentional state action."

*Id.* at 240, 96 S.Ct. at 2047.

In the following term, the Court reiterated: "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). In its most recent school desegregation cases, the Court has adhered to this principle. *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 97 S.Ct. 2166, 53 L.Ed.2d 851 (1979); *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).

The inquiry into intent can be avoided only if the challenged statute contains an explicit suspect classification:

> Certain classifications, ... in themselves supply a reason to infer antipathy. Race is the paradigm. A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon extraordinary justification.... This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination.... But, as was made clear in *Washington v. Davis* ... and *Arlington Heights* ..., even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (citations omitted).

My disagreement with the majority is that I do not believe Initiative 350 contains a racial classification. Rather, the initiative is a neutral law that must be analyzed in terms of its intent.

## B

Initiative 350 does not treat persons differently on the basis of race. It does treat student assignments designed to obtain racially balanced schools differently than student assignments for other purposes. In my view that is not a suspect racial classification.

The policy question, whether student assignments beyond the next nearest school should be used to overcome *de facto* segregation, is at the heart of the choice Initiative 350 presented to the voters. That question has little to do with the question whether such assignments should be permitted for purposes of special education, or to avoid health and safety hazards.

Clearly, the problems of racial segregation and inequality are central to the former question. Mr. Justice Powell has noted the intensified debate over the educational benefits of integration. He has suggested the indisputable benefits of having young

persons attend schools with diverse student bodies "often will be compromised where the methods employed to promote integration include coercive measures such as forced transportation to achieve some theoretically desirable racial balance." *Columbus Board of Education v. Penick*, 443 U.S. 449, 485 n.5, 99 S.Ct. 2941, 2991 n.5, 61 L.Ed.2d 666 (1979) (Powell, J., dissenting). *See Estes v. Metropolitan Branches of Dallas, NAACP*, 444 U.S. 437, 100 S.Ct. 716, 717, 62 L.Ed.2d 626 (1980) (Powell, J.) (dissent from denial of certiorari).

The Justice's comments suggest the nature of the question presented to the voters. There is no classification on the basis of race in resolving that question in favor of neighborhood schools, while permitting distant assignments for other purposes.

Moreover, the majority recognizes, as was found by the district court, that the legislative purpose of Initiative 350 was to adopt a neighborhood schools policy. We held recently that a neighborhood schools policy is not constitutionally suspect. *Diaz v. San Jose Unified School District*, 612 F.2d 411, 415 (9th Cir. 1979). It is inconsistent to hold now that the adoption of such a policy creates a suspect racial classification.[1]

That holding is also inconsistent with the Supreme Court's school desegregation cases. The laborious inquiry into intent, *see Columbus* and *Dayton, supra*, could be avoided under the majority's analysis, by simply finding an explicit racial classification any time a school district bused students for special education or other reasons, while refusing to do so to desegregate its schools.

### C

The majority's analysis ultimately turns on Initiative 350 being a statewide initiative. It states this is the "crucial fact," and suggests a different result had the neighborhood schools policy been adopted by local school boards. Maj. op. at 1345–1346 n.8. Indeed, it is clear that the Seattle School District could rescind the Seattle Plan without violating the Fourteenth Amendment. *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 413–14, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977).

It is not clear how the exercise of state power creates a racial classification here. The history of governmental attempts to deal with racial discrimination is replete with federal and state laws directing subordinate governmental entities not to take certain actions on the basis of race. Those laws do not contain explicit racial classifications. By addressing a problem involving a racial minority, the state does not create *ipso facto* a racial classification.

*Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), does not support the majority's analysis. The Akron City Council had enacted a fair housing ordinance. The citizens of Akron subsequently by amendment to the city charter required any ordinance regulating the use or sale of real property on the basis of race to be approved by the voters before becoming effective. The amendment applied to the fair housing ordinance.

The Court did not hold that the repeal of the existing ordinance violated the Fourteenth Amendment. 393 U.S. at 390, n.5, 89 S.Ct. at 560, n.5. It held the charter amendment violated the equal protection clause because it subjected ordinances aimed at eliminating racial discrimination in housing to a more burdensome legislative process than other ordinances.

Initiative 350 in no way alters the legislative process in the State of Washington. It does not subject legislation sought by racial or other minorities to procedures more burdensome than those applicable to other legislation.

1. The majority's reliance on *North Carolina Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), is misplaced. The majority suggests the Supreme Court held a state anti–busing statute unconstitutional because it interfered with the discretion of school districts to adopt desegregation programs that are not constitutionally required. The opinion held the statute unconstitutional because of its interference with *constitutionally required* remedies.

The difficulty with the majority's analysis, supported in part by dictum in *Lee v. Nyquist*, 318 F.Supp. 710 (W.D.N.Y.1970), *aff'd*, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971),[2] is that it confuses treatment of racial problems with treatment on the basis of race. The latter, of course, is suspect. But "racial" problems, such as school desegregation, must be dealt with in terms of the specific problem and specific solutions. The state does not create a classification on the basis of race in so doing.

### D

Initiative 350 is an exercise of the state's constitutional responsibilities in the field of public education.[3] The state constitution decrees that it is "the paramount duty of *the state* to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste or sex." Wash.Const. Art. IX, § 1 (emphasis added). "The *legislature* shall provide for a general and uniform system of public schools." Art. IX, § 2 (emphasis added). *See Seattle School District v. State*, 90 Wash.2d 476, 518, 585 P.2d 71, 95 (1978) (state legislature has responsibility for organization, administration and operational details of elementary and secondary education).

In *Mandatory Busing v. Palmason*, 80 Wash.2d 445, 495 P.2d 657 (1972), the Washington Supreme Court considered a challenge to a desegregation plan adopted by the Seattle School District and approved by the State Superintendent of Public Instruction. The court stated that a local initiative could not be used to overturn the plan:

Initiative and referendum procedures can be invoked at the local level only if their exercise is not in conflict with state law .... Clearly they cannot be used to interfere in the management of *the state's school system*.

80 Wash.2d at 450, 495 P.2d at 661 (emphasis added) (citation omitted). It is ironic that a federal court would now hold that the state itself may not interfere in its own school system.

The majority's claim that "Initiative 350 effectively disenfranchises the voters of the local school districts" ignores the district court's finding that 60% of the voters in Seattle voted in favor of the initiative. In any case, a statewide, rather than local, initiative was required by *Palmason*. Its use does not, in my view, create an explicit racial classification.

### II

The district court's second argument was that discriminatory intent was a motivating factor in the adoption of Initiative 350.

Proof of discriminatory intent must be gleaned from objective factors, several of which were outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977): (1) discriminatory impact; (2) historical background; (3) specific sequence of events culminating in the decision; (4) departures from the normal procedural and substantive sequence; and (5) legislative and administrative history.

The burden is on the party challenging a statute to prove that discriminatory intent was a motivating factor in its adoption. *Id.* at 265, 270, 97 S.Ct. at 563, 566.

The district court did find that "racial bias or racial motivation is a factor in the opposition to the 'busing' of students to attain racial balance." Finding of Fact 3.7. A two–fold response to this purported finding is necessary. First, there is insufficient evidence in the present record to support a

---

2. *Lee*, like *Hunter*, involved a statute which differentiated the way in which measures were enacted depending on their content; the procedures for enacting measures benefiting a racial minority were more burdensome.

3. The state constitution vests legislative authority in the legislature, but reserves to the people the power to enact bills independent of the legislature. Wash.Const. Art. II, § 3. An initiative, then, is an exercise of the state's legislative power. *See Love v. King County*, 181 Wash. 462, 469, 44 P.2d 175, 178 (1935) (passage of initiative is an exercise of same power of sovereignty as passage of a statute by the legislature).

finding of racial bias as to Initiative 350 under the standards developed by the Supreme Court. Second, any ultimate determination as to the presence or absence of discriminatory intent is a highly mixed question of law and fact, reviewable on appeal.

The district court based its finding of discriminatory intent on three factors. First, it found the effect of Initiative 350 would be racially imbalanced schools in Seattle, Tacoma, and Pasco. It found there would be a disproportionate adverse impact on minority students as a result of that imbalance. *See* Finding of Fact 3.1(a).

Second, it examined the historical background and sequence of events leading to the adoption of the initiative, and concluded it was intended to prevent implementation of the Seattle Plan (*i. e.*, racial balancing of Seattle schools by means of mandatory busing). For example, the court pointed to an unsuccessful recall election designed to remove members of the Seattle Board of Education who supported mandatory busing.

Third, the court considered Initiative 350 to be a marked departure from the "procedural norm," in that a local decision was overridden in a statewide initiative.

These factors do not support the district court's conclusion that a discriminatory intent was a motivating factor behind adoption of Initiative 350.

### A

The underlying sociological and political assumptions equating quality education with integration have been questioned. *See* N. St. John, *School Desegregation Outcomes for Children* 136 (1975).[4] To the extent the district court found the disproportionate adverse impact of Initiative 350 on minority students to be a "certainty," *see* 473 F.Supp. at 1015, its finding was clearly erroneous.

**4.** *See* Bell, *Book Review*, 92 Harv.L.Rev. 1826 (1979), and studies reviewed therein. *See also* D. Armor, *The Evidence on Busing*, 28 Pub.Interest 90 (1972). *Cf.* J. Coleman, S. Kelly & J.

Moreover, the Supreme Court has consistently disavowed the proposition that foreseeable impact alone is adequate to prove intent. Additional indicia of discriminatory intent are required. *See Keyes v. School Dist. No. 1, Denver*, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973); *Columbus Board of Education v. Penick*, 443 U.S. at 464, 99 S.Ct. at 2950 (disparate impact and foreseeable consequences, without more, do not establish a constitutional violation). Discriminatory purpose "implies the decisionmaker ... selected or reaffirmed a particular course of action at least in part *'because of,'* not merely *'in spite of,'* its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296 (emphasis added).

### B

The historical events cited by the district court are not probative of discriminatory purpose. Assuming that Initiative 350 was prompted by opposition to the Seattle Plan, there is no evidence in the record indicating that opposition to the Seattle Plan was in turn motivated by discriminatory intent. Indeed the district court specifically found that the backers of the initiative acted responsibly in their advocacy of the initiative and did not direct appeals to the racial biases of voters. Finding of Fact 7.27.

Accepting the findings that opposition to the Seattle Plan was the primary motivation behind Initiative 350, the record is devoid of evidence to contradict the state's contention that historical opposition to the Seattle Plan was motivated by race–neutral concerns. *See* Findings of Fact 7.30, 7.31, and 7.32. Absent this second linkage, the cited historical and sequential events are simply not probative in establishing discriminatory purpose in the subsequent enactment of Initiative 350.

Moore, *Trends in School Segregation*, 1968–73 (1975) (concluding school desegregation a significant cause of white flight).

## C

The concept of a procedural departure from the norm has not been clearly defined. No argument is advanced, however, that the proponents of Initiative 350 failed to follow proper administrative or statutory procedures for its enactment.

Washington voters have utilized the initiative and referendum devices extensively in recent years. *See* Comment, *Judicial Review of Laws Enacted by Popular Vote*, 55 Wash.L.Rev. 175, 179, n.29 (1979). Any procedural departure from the norm is of minimal probative value here, since it was required by a decision of the state supreme court. *See* §§ I–C & I–D, *supra*.

At best, the court is left with an inference of intent solely from foreseeable impact. While disproportionate impact on a racial minority may be highly probative of discriminatory intent, it is not a conclusive evidentiary factor. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. at 278, 99 S.Ct. at 2295. Plaintiffs have failed to sustain their burden of proof on this issue. The factual findings on intent do not establish that support for Initiative 350 or opposition to the Seattle Plan was motivated by discriminatory intent.[4A]

## III

Borrowing from an analytical structure developed in the area of First Amendment rights, the district court invalidated Initiative 350 for overbreadth. I disagree.

The doctrinal basis of the court's conclusion is ill–defined. Traditionally, the overbreadth doctrine is applied when a possibility exists that a constitutionally protected activity may be "chilled". *See NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963) (enforcement of barratry law may be invalid if it prohib-

its exercise of First Amendment rights). It is a departure from the normal mode of constitutional adjudication, justified by the favored status of First Amendment rights to free expression and association. *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1940).

Variants or analogues of overbreadth scrutiny rarely have arisen in the adjudication of other preferred claims. *Compare Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (applying overbreadth doctrine and finding burden on Fifth Amendment right to travel) *with United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (invalidating section of same act for First Amendment overbreadth).[5] Courts have developed different methods of strict review to protect other preferred interests. *See generally* Comment, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 852 (1970). Although similarities exist between equal protection scrutiny and the overbreadth doctrine, the latter should not supplant or supplement the former in its area of application.

Under equal protection analysis, labeling a classification as over–inclusive does not determine its compatibility *vel non* with the equal protection clause. Under– and over–inclusiveness must be viewed with reference to the means–end relationship. *Eisenstadt v. Baird*, 405 U.S. 438, 447–54, 92 S.Ct. 1029, 1035–38, 31 L.Ed.2d 349 (1972).

Appellees do not assert that the initiative impermissibly restricts First Amendment rights. Rather, they assert that it restricts a constitutional duty under the Fourteenth Amendment.

They cannot assert, however, that an affirmative duty makes their current desegregation plans constitutionally necessary, as

---

**4A.** *See* Note, 55 Wash.L.Rev. 735 (1980) (concluding district court's opinion unsound in its inference of discriminatory intent solely from the decision to maintain a neighborhood schools policy).

**5.** The Court in *United States v. Robel* declined to address Fifth Amendment arguments. 389 U.S. 258, 261, n.5, 88 S.Ct. 419, 422, n.5, 19

L.Ed.2d 508 (1967). It noted that *Aptheker v. Secretary of State* had been decided under the Fifth Amendment. 389 U.S. at 263, 88 S.Ct. at 423. *See also Aptheker v. Secretary of State*, 378 F.2d 500, 521 (Clark, J., dissenting) (distinguishing *Thornhill v. Alabama* and *NAACP v. Button* as First Amendment cases).

there has been no determination, judicial or otherwise, of *de jure* segregation. It is their position that Initiative 350 could operate to inhibit or prevent busing remedies to remedy constitutional violations.

The record indicates that the framers and enforcers of Initiative 350 intended that it not interfere with a constitutional duty. This is reinforced by the language of the enactment itself. Section 6 provides:

This chapter shall not prevent any court of competent jurisdiction from adjudicating constitutional issues relating to public schools.

It is axiomatic that courts should endeavor to construe statutes in a constitutionally permissible manner. *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973) (stating that court should not "destroy" a statute but should construe it to comport with constitutional limitations); *Lynch v. Overholser*, 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (interpreting statute to "free" it from constitutional doubts). Facial invalidation for overbreadth is an "extreme" remedy to be avoided if a constitutional construction is possible.

It is not only possible but expressly required that Initiative 350 be construed as not restricting a school district's performance of a constitutional duty to desegregate. The measure is not an "absolute prohibition" against student assignments for racial balance that would "inescapably operate to obstruct" federal court remedies. *See North Carolina State Board of Education v. Swann*, 402 U.S. 43, 45–46, 91 S.Ct. 1284, 1285–86, 28 L.Ed.2d 586 (1971).

The statute here does not prohibit busing beyond the next nearest school when necessary to fulfill a constitutional duty. Initiative 350 subordinates its neighborhood schools policy to constitutional imperatives.

## IV

Initiative 350 presented a sensitive policy issue to the voters. The issue is of special concern to minority groups. Yet absent prior constitutional violations or impermissible motives, I see no reason why the issue should be resolved by federal judges rather than through the legislative process. I would reverse and remand to the district court.